489 A.2d 748

**Norman C. MANBECK**

**v.**

**Shirley R. MANBECK, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 22, 1984.

Filed Feb. 6, 1985.

Reargument Denied April 11, 1985.

494

J. Robert Zane, Schuylkill, for appellant.

Maureen E. Hogan, Pottsville, for appellee.

Before WICKERSHAM, MONTEMURO and MONTGOMERY, JJ.

WICKERSHAM, Judge:

Norman and Shirley Manbeck were married on September 22, 1956. Plaintiff-appellee Norman Manbeck filed a complaint in divorce on May 14, 1980. The complaint alleged a cause of action under section 201(a)(6) of the Divorce Code [1] (indignities), and a cause of action under section 205(a)(4) of the Divorce Code [2] (impotency of the defendant-appellant Shirley Manbeck). Shirley Manbeck filed an answer containing a counterclaim for indignities under section 201(a)(6). She also filed claims for alimony and counsel fees and requested that the parties' marital property be equitably distributed.

A master was appointed and hearings were held. The master recommended that the court grant an annulment on the ground that appellant was and is impotent. The master found that each party was capable of supporting himself or herself and that each could provide for his or her reasonable needs. Thus, he recommended that no alimony be granted. He also found that the parties should pay their own counsel fees and costs. Each party was granted a one-half (½) interest in the marital home and, with one exception, the other marital property was equitably divided.

1. Act of April 2, 1980, P.L. 63, No. 26, § 201, 23 P.S. § 201(a)(6).
2. Act of April 2, 1980, P.L. 63, No. 26, § 205, 23 P.S. § 205(a)(4).

Appellant filed timely exceptions to the master's report. With the exception of the issue of appellee's pension, the lower court concurred in the findings and recommendations of the master, and dismissed all of appellant's exceptions, except those relating to the distribution of appellee's pension plan.[3] In an opinion and order dated July 19, 1982, the Honorable Donald D. Dolbin granted Norman Manbeck an annulment pursuant to section 205(a)(4) of the Divorce Code. Shirley Manbeck's requests for alimony and counsel fees were denied. This appeal timely followed.

Appellant presents a number of issues for our consideration.[4] The first issue is stated as follows:

Did the lower Court err in recommending that an annulment be granted on the grounds that wife was naturally and incurably impotent at the time of the marriage?

Brief for Appellant at 3.

[1] To justify the grant of an annulment on the grounds of impotency it must be proven that the impotency is natural and incurable. 23 P.S. § 205(a)(4). Appellant concedes that the parties never completed vaginal intercourse during the marriage. She argues, however, that appellee failed to meet his burden of proving that she was "impotent" and that this impotence was "incurable." She also avers that appellee's claim with regard to her alleged impotency is barred by the doctrine of laches.

3. In his order of July 19, 1982, Judge Dolbin remanded a portion of the case to the master for the purpose of taking testimony on the issue of the disposition of appellee's pension plan.

4. Given our disposition of this appeal, we find it unnecessary to address appellant's fifth issue which she states as follows:

Did the lower court err in not granting wife a divorce on the grounds of indignities?

Brief for Appellant at 3.

It is true that neither the master nor the lower court discussed or ruled on appellant's counterclaim. While we do not condone this omission, we feel that given our affirmation of the grant of the annulment, it is unnecessary to have the court consider appellant's counterclaim.

We will address the laches question first. Generally, mere delay in bringing a divorce action is not a ground for denial of the relief sought. *Regan v. Regan*, 227 Pa.Super. 552, 322 A.2d 711 (1974). The *Regan* case noted, however, that long delay in bringing a divorce action *after separation*, although not grounds for denial in and of itself, casts doubts on the good faith of the plaintiff. We note that in the case *sub judice*, plaintiff-appellee filed his complaint in divorce on May 14, 1980, almost one month *before* the parties separated in early June of 1980. Thus, there was no delay in filing the complaint after separation.

■ In another case discussing the effect of delay in bringing a divorce action, this court stated:

> Although it is true that long delay in bringing a divorce action casts doubt on the good faith of the plaintiff, it does not bar a decree where the right to a divorce is otherwise clearly established. *Gillen v. Gillen*, 195 Pa. Super. 60, 169 A.2d 340 (1961). It only affects the credibility of the plaintiff in the consideration of the finder of the facts.

*Campbell v. Campbell*, 205 Pa.Super. 207, 211, 208 A.2d 36, 38 (1965). We find that the delay in the instant case goes only to the credibility of the appellee and the weight to be given the evidence; the delay does not create an absolute bar to appellee's cause of action.

Pursuant to the *Campbell* case, *supra*, the question then becomes: was appellee's right to an annulment otherwise clearly established. Appellant argues that appellee failed to meet his burden of proving that she was incurably impotent. As previously stated, both parties admit that they never completed vaginal intercourse during the marriage. At the master's hearing on November 10, 1981, appellant presented the testimony of Doctor Harold B. Cooper. The testimony of Dr. Cooper and the written report of Doctor Richard Kleppinger entered into the record indicated that while appellant is physically capable of sexual intercourse, she suffers from a psychological or emotional disorder referred to as a "sexual disfunction." Dr. Cooper

further testified that a person diagnosed as having a sexual disfunction "would be someone that cannot participate with normal sexual intercourse." N.T., 11–10–81, at 32.

We must first decide whether appellant's "sexual disfunction" is sufficient evidence on which to base a finding of impotence. As the trial court noted, there is little appellate case law in Pennsylvania dealing with the subject of male impotence, and even less with female impotence. In *Wilson v. Wilson*, 126 Pa.Super. 423, 191 A. 666 (1937), this court held that impotence as a cause for divorce[5] means the incapacity for sexual intercourse. We agree with the lower court that this definition includes "incapacity not only resulting from physical malfunction or impairment of the sexual organs, but also incapacity based upon emotional or psychological factors." Lower ct. op. at 5–6. *See, Rickards v. Rickards*, 3 Storey 134, 53 Del. 134, 166 A.2d 425 (1960); *Hiebink v. Hiebink*, 56 N.Y.S.2d 394, *aff'd*, 269 App.Div. 786, 56 N.Y.S.2d 397 (1945). Instantly, appellant's own witness testified that a person diagnosed as having a sexual disfunction would be someone that cannot participate with normal sexual intercourse. We find that appellant's sexual disfunction makes her incapable of normal sexual intercourse and thus is a valid ground for annulment of the parties' marriage.

Appellant next claims that appellee failed to prove that she is "incurably" impotent. It is true that no doctor testified that appellant's condition was incurable. It is also true, however, that there was no testimony that appellant's sexual disfunction was curable.[6] Of course, appellee bore

5. Prior to the promulgation of the Divorce Code of 1980, impotency was grounds for *divorce*. Section 205(a)(4) of the Divorce Code allows an individual to secure an *annulment* if the other spouse, at the time of marriage, was and still is naturally and incurably impotent. We do not believe that the fact that the Divorce Code changed the type of relief granted from a divorce to an annulment effects prior case law with regard to the definition of impotency.

6. When asked how he would treat appellant's problem, Dr. Cooper replied: "The patient and partner should be referred for prompt [sic] psychological and emotional and sexual counseling and guidance."

the burden of proving his wife's "incurability." Since no medical testimony established whether appellant's condition was incurable or not, we must look at the other evidence presented in order to determine whether appellee met his burden of proof.

The majority of appellee's evidence on the annulment ground had to do with the parties' failure to consummate the marriage over a twenty-four (24) year period. Appellee testified that he had attempted to have intercourse with his wife on innumerable occasions. Each attempt was ultimately rebuffed when appellant told her husband that she was tired or didn't feel well.[7] Appellant admits that no vaginal intercourse had, in fact, occurred throughout the marriage.

At this point, we find it appropriate to note that there is no appellate case law in Pennsylvania that holds that a presumption of impotence arises where no intercourse has taken place for a given length of time. Some New Jersey cases, on the other hand, have adopted the rule of triennial cohabitation. This rule provides that a presumption of impotence may arise from the wife's remaining a virgin for three (3) years, during which time the parties cohabit. *See Bissell v. Bissell*, 93 N.J.Eq. 537, 117 A. 252 (1922); *Tompkins v. Tompkins*, 92 N.J.Eq. 113, 111 A. 599 (1920). *See also Heller v. Heller*, 116 N.J.Eq. 543, 174 A. 573 (1934) (stating that although incurability may be pre-

N.T., 11–10–81, at 22. This does not indicate, however, that such counseling would necessarily *cure* appellant.

7. As the lower court aptly stated:
   The sexual problems in this unhappy union commenced on the honeymoon and have persisted for the last twenty-four years. When husband tried to confide his desires to his bride a thousand or so times, the object of his love quest told him to "knock it off" or that she was tired and didn't feel good. However, hope resided abundant in husband's emotional reservoir and he persisted throughout twenty-four years, or two hundred eighty-eight months to attempt to cement their union in a concrete manner. Vain and fruitless were his attempts for his wife's reluctance or sexual short-circuit could not be overcome and she remained insurmountable and to him, her problems-impenetrable and inscrutable. It is an instance of: "The spirit is unwilling though the flesh be strong". Lower ct. op. at 6.

sumed from the establishment of appropriate facts, such as continued cohabitation where the wife is apt yet remains a virgin, a period of two (2) months was wholly inadequate to cause a presumption to arise). While we do not specifically adopt the rule of triennial cohabitation, we feel that the reasoning giving rise to the rule is valid. There are cases in which incurable impotency can be inferred from the facts and circumstances. This is such a case. Instantly, appellant has been diagnosed as having a "sexual disfunction." Appellant admits that, despite her husband's repeated attempts, no intercourse had taken place throughout the twenty-four (24) year marriage. We find that, given the facts of this case, there was sufficient evidence to infer that appellant is incurably impotent. Thus, we affirm the lower court's grant of an annulment based on section 205(a)(4) of the Divorce Code.

Appellant's next two (2) issues are stated as follows:

Did the lower Court err in denying the low income wife any alimony despite the much higher income of husband and the existence of a twenty-four (24) year marriage?

Did the lower Court err in denying wife any counsel fees or costs whatsoever?

Brief for Appellant at 3.

■ Our scope of review as to essentially monetary judgments in divorce actions is limited. Orders regarding alimony and counsel fees should be reviewed only for an abuse of discretion. *Remick v. Remick*, 310 Pa.Super. 23, 456 A.2d 163 (1983). Under this standard, we are not to usurp the trial court's duty as the finder of fact. *Ruth v. Ruth*, 316 Pa.Super. 282, 462 A.2d 1351 (1983).

In the case *sub judice*, the master found that appellant has failed to meet the statutory requirements to justify an award of alimony. Initially, the master found that appellant is able to support herself through her present self-employment as a dog groomer. *See* section 501(a)(2).[8] Appellant testified that during her marriage to Norman she

8. Act of April 2, 1980, P.L. 63, No. 26, § 501, 23 P.S. § 501(a)(2).

worked only part time at her dog grooming business and that her income during that time was between $2,500.00 and $3,000.00 per year. (N.T., 11–10–81, at 56–57). The master obviously believed that appellant could increase her income by expanding her business and working longer hours.[9] That the lower court agreed with the master's finding is apparent from its statement: "It is clear from the record that [appellant] by virtue of her pet grooming business is quite capable of maintaining herself." Lower ct. op. at 9. We find no abuse of discretion in that conclusion.

Appellant points to the unequal income of the parties as support for her argument that alimony should have been awarded. The master stated:

> [Appellant], while not earning the same amount of yearly income as [appellee], has an established trade and is employed as a dog groomer. Given the fact that both parties are regularly employed at admittedly satisfactory jobs, no particular significance could be placed on the relative earnings and earning capacity of the parties.

Master's Report, R.R. for Appellee at 22a. Thus, the master apparently decided that while the relative earnings of the parties are unequal at the present time, the earning *capacities* of the parties are similar. We believe that the record sufficiently supports this conclusion.

■ We hold that the findings and conclusions reached by the master and adopted by the lower court are supported by the testimony and evidence of record. The master considered each of the factors set forth in section 501 of the Divorce Code and set forth his reasons for denying an award of alimony. The lower court adopted the master's report. We find no abuse of discretion.

9. We believe this to be the basis of the master's analysis given his comments regarding the distribution of marital property: "[S]ince [appellant] is self-employed, [appellant] is able to a certain extent to control her income depending on how much time [appellant] desires to work.... [Appellant] has the potential to increase her income in her self-employment." Master's Report, R.R. for Appellee at 30a–31a.

■ The master also recommended that each party bear his or her own costs and counsel fees. The court adopted this recommendation. Given the economic considerations already discussed, we again find no abuse of discretion.

Appellant's fourth issue deals with equitable distribution:

Did the lower Court err in dividing the marital home equally therefor forcing wife to vacate the premises and her place of employment?

Brief for Appellant at 3.

■ At this point, we must reiterate that the lower court remanded the issue of the division of appellee's pension plan to the master for further hearings and recommendations. Thus, it is clear that we do not have the entire equitable distribution plan before us. We are of the opinion that we should not consider the propriety of a portion of the equitable distribution plan when some of the marital property has not yet been divided.

In his order of July 19, 1982, Judge Dolbin dismissed appellant's exceptions to the Master's Report; however, since he found it necessary to remand the pension plan issue to the master, Judge Dolbin did not enter a final order as to the equitable distribution of marital property. Since there is no final order of equitable distribution, we will not address any equitable distribution issues. *Murphy v. Brong*, 321 Pa.Super. 340, 468 A.2d 509 (1983) (per curiam) (order dismissing exceptions is not a final order and, therefore, not appealable). Thus, we must remand the case to the lower court so that the division of appellee's pension plan may be decided. The court should also consider the effect, if any, of the division of the pension plan on the division of the other marital property.

Affirmed in part and remanded for proceedings not inconsistent with this opinion. Jurisdiction is relinquished.

MONTEMURO, J., files a concurring and dissenting opinion.

MONTEMURO, Judge, concurring and dissenting:

While I agree with the majority's decision that review of the equitable distribution plan is premature at this time, I disagree with the majority's conclusions that: (1) laches is inappropriate here, and (2) the trial court did not abuse its discretion regarding the denial of alimony to appellant.

The majority rejects appellant's laches argument by relying on the often repeated principle that mere delay in bringing a divorce action after separation is not ground for denial of relief sought. *Regan v. Regan*, 227 Pa.Super. 552, 322 A.2d 711 (1974). In applying this principle, the majority notes that the appellee filed his complaint "in divorce" before separation, so there was no delay after separation at all; and, in any event, delay would only affect the credibility of appellee in the consideration of the finder of fact. *Campbell v. Campbell*, 205 Pa.Super. 207, 208 A.2d 36 (1965).

Although I acknowledge the soundness of this principle, it stems from actions in divorce based on fault grounds. My research has not revealed any cases wherein this principle was applied to the annulment of a voidable marriage, and, in my view, such a principle should not apply to actions of annulment of a voidable marriage, as is the case before us.[1]

In actions of divorce based on fault grounds, the principle that delay goes only to credibility derives from concerns of the authenticity of the alleged fault grounds, such concerns arising at a time prior to the implementation of no-fault divorce. If there was a long delay after the alleged fault grounds accrued and before the divorce action was brought, the delay raised the question of whether the divorce was brought in sincerity and truth for those grounds, or wheth-

1. Appellee's complaint prayed for divorce on the grounds of indignities, as well as annulment of a voidable marriage under 23 P.S. § 205(a)(4). The master found that appellee had failed to establish grounds for a divorce based on indignities, but concluded that an annulment was proper. The trial court did not address the propriety of the indignities claim, but considered only the annulment claim, and granted the annulment.

er the divorce had been brought for the mere purpose of being freed and separated from a spouse. *Garroway v. Garroway*, 361 Pa. 464, 65 A.2d 414 (1949).[2]

Here, however, we do not have the issue of delay raised in the context of an action for divorce brought on fault grounds. Instead, the question of delay before us arises in an action for annulment of a voidable marriage, which is significantly different from a divorce on fault grounds. A voidable marriage is valid and subsisting unless and until challenged by either party, *In Interest of Miller*, 301 Pa.Super. 511, 448 A.2d 25 (1982); but contains an impediment or defect at its inception which permits the marriage to be nullified. N. PERLBERGER, PENNSYLVANIA DIVORCE CODE § 3.2.1 (1980). Most importantly, the defect can be ratified or condoned, thereby barring any attack on the validity of such voidable marriage. *Id.;* 23 P.S. § 205(b).[3]

Thus, while delay in an action in divorce based on fault grounds goes only to credibility, delay in an action of annulment of a voidable marriage can be a type of ratification which will act as a *complete defense.*[4] In an action of annulment of a voidable marriage, the factor of delay

**2.** In *Garroway,* the husband commenced an action for divorce based on indignities which had allegedly occurred over seventeen years previously. The court held that the husband had not brought the action on the grounds of indignities in good faith, and intimated that his motive might have been to terminate an existing court order for his wife's support.

**3.** 23 P.S. § 205(b) provides: "... The validity of such voidable marriage shall not be subject to attack or question by any person if it is subsequently *confirmed* by the parties thereto ..." (emphasis added).

**4.** Estoppel because of delay is not new to actions of voidable marriages. If annulment actions based on certain types of voidable defects are not commenced within sixty days after the marriage ceremony, the marriage is no longer deemed to be voidable. 23 P.S. § 205(a)(2, 3). In actions alleging voidable defects based on fraud, duress, coercion, or force, if, after discovery of the unlawful conduct, the complainant voluntarily continues cohabitation, an action of this ground will be barred. N. PERLBERGER, *supra*, § 3.2.3(d). Even in annulment actions where the marriage was void rather than merely voidable, timeliness has been responsible for barring the action. *Diamond v. Diamond*, 501 Pa. 418, 461 A.2d 1227 (1983); *Wisecup v. Wisecup*, 190 Pa.Super. 384, 154 A.2d 332 (1959).

does not merely require us to consider whether the asserted defect is a trumped-up guise, but whether, *assuming the validity of the defect,* the complainant has *ratified* that defect.

Other jurisdictions have held that laches is applicable to bar an action of annulment based on impotency where the complaining spouse continues to live with the offending spouse for an unreasonable length of time after learning of the impotency. *See* cases discussed in Annot., 52 A.L.R.3d 589 § 22 (1973); Annot., 28 A.L.R.2d 499 § 7 (1953). Appellant specifically points to *Kirschbaum v. Kirschbaum,* 92 N.J.Eq. 7, 111 A. 697 (1920), where a wife, having lived with her husband for eleven years, brought an action for annulment based upon his impotence. The court held that where the wife had accepted and enjoyed the benefits, such as they were, of a merely platonic marriage for more than eleven years, she could not be permitted to repudiate the contract but was held to have ratified it by conduct which she in no way explained. The court noted that in the absence of explanation, they would not meddle with what the complaining party's conduct showed, though a considerable number of years, to be no grievance.

Our research has not found any Pennsylvania cases addressing this issue, however, in *Wilson v. Wilson,* 126 Pa.Super. 423, 191 A. 666 (1937), this court approvingly referred to *Kirschbaum* in dicta. The *Wilson* court dealt with the issue of whether natural and incurable impotency meant sterility or the inability to copulate. After deciding that the wife's sterility did not amount to natural and incurable impotency; the court pointed out that, although they did not decide whether fraudulent concealment of known and permanent sterility would be a ground for annulment in Pennsylvania, the husband had continued to cohabit with the wife for two and one-half years after he knew of her true physical condition, and cited *Kirschbaum.*

I would agree with the reasoning of *Kirschbaum* and hold that laches is applicable to an action in annulment based on impotency. In a suit for nullity of a marriage,

where, as here, the facts and circumstances so plainly imply that the complaining spouse recognized the existence and validity of the marriage and accepted the status of husband or wife, it would be most inequitable and contrary to public policy that he or she should be permitted to treat the marriage relation as if it never existed. *See Donati v. Church*, 13 N.J.Super. 454, 80 A.2d 633 (1951).[5] Thus, I would find that appellee's twenty-four year delay in challenging the validity of the marriage exhibited his ratification of appellant's impotency, and so he is barred from asserting appellant's impotency now as a basis for annulment.

I am also in disagreement with the majority concerning the issue of alimony. The majority finds no abuse of discretion in the trial court's denial of alimony, which was based on the master's recommendation. The lower court's reasoning for the denial of alimony was encapsulated in its statement that "It is clear from the record that the [appellant] by virtue of her pet grooming business is quite capable of maintaining herself." Lower Court Opinion at 9. To the contrary, it is far from clear that appellant can maintain herself on the income from her pet grooming business.

The evidence presented at the master's hearing revealed that appellant's dog grooming business took in $3,309.60 gross income in 1980, or $2,769.26 net income. This income figure was not disputed; however, it represented appellant's efforts only in the evening and on Saturdays. The master's finding that appellant was able to support herself through dog grooming apparently reflected a conclusion that if appellant pursued dog grooming on a full-time basis,

5. Of course, where the complaining party's delay in moving for annulment on the basis of impotency is explained by bona fide hopes of improved condition, the complaining spouse would not have ratified the marriage. *See Singer v. Singer*, 9 N.J.Super. 397, 74 A.2d 622 (1950). In the case at bar, appellee testified that he made attempts to have sex with his wife until 1972 or '73, and after that he gave up. N.T. August 11, 1981, at 27. Without deciding whether intermittent attempts to have sexual intercourse would constitute bona fide hopes of an improved condition, appellee's continued residence with appellant after 1972 or '73, was not explained.

she would have the *capacity* to support herself. This hypothetical earning potential of appellant was belied by the record, however.

Appellant testified that since the separation, she had been available for full-time employment, but that her workload had not increased. N.T. November 10, 1981, at 65. She later explained that most of her customers worked and, consequently, the only time that they brought their pets for grooming was in the evening. *Id.* at 74–75. She further testified that it was rare that a Saturday grooming was requested *Id.* When questioned by the master as to whether she would be prevented from pursuing her dog grooming business during the day, appellant responded that she had problems with her hands,[6] and that she would need money to advertise in order to build the business up. *Id.* at 75–76.

From this evidence, the master blithely concluded that the dog grooming business *could be expanded* to enable appellant to support herself. While it is true that a court has the power to look beyond actual earning to consider earning capacity, *Commonwealth ex rel. Hargrave v. Hargrave,* 275 Pa.Super. 198, 418 A.2d 680 (1980); such extrapolation must have a realistic basis. Thus, if the party's prior work experience or educational background denotes that the party is not earning up to his or her proven or assured ability, a court may substitute capacity to earn for actual earning in the determination of income.

Here, however, there are no indices that appellant has the capacity to support herself by virtue of her dog grooming business. By her undisputed testimony, she has held herself out for full-time operation, but her workload has not increased. Further, there is no evidence that the Pine Grove area, where appellant resides, could ever supply enough dog grooming business in order to double or triple

6. Appellant testified that she had developed a rash on her hands which restricted her washing of the dogs. *Id.* at 55–56. Her mother testified and confirmed that she had to help appellant wash the dogs because of the condition of appellant's hands. *Id.* at 80. Dr. Harold B. Cooper, appellant's family physician, testified that appellant had infected dermititis. *Id.* at 34.

the size of appellant's present operation. Finally, the master ignored the practical problem of where appellant would conduct the business once the marital home was sold. Appellant testified that she was currently operating out of the basement of the house. *Id.* at 37. Since the property was equally divided between the parties in equitable distribution, appellant will be forced to relocate her residence and at the same time find a facility which would accommodate the "expanded" dog grooming enterprise. Thus, the finding that appellant is able to support herself as a dog groomer, rather than being "clear", was clearly erroneous.

After the divorce was filed, appellant realized that she could not support herself by dog grooming and the $47.00 per week court-ordered support payment by appellee. *Id.* at 76. Appellant enrolled at Reading Area Community College and pursued a computer science/management program so that she would be able to support herself. *Id.* at 54–55. She discontinued the program after one semester because of lack of funding and problems with her nerves. In light of the limited, rehabilitative purpose of alimony, a temporary order of alimony to allow appellant time to build-up her dog grooming business and/or re-educate herself for the job market would seem to be in order.[7]

Correcting the lower court's finding regarding appellant's ability to support herself through employment, the guidelines for determining alimony set forth in 23 P.S. § 501(b) indicate that an award of alimony would be appropriate. That statute provides:

(b) In determining whether alimony is necessary, and in determining the nature, amount, duration, and manner of payment of alimony, the court shall consider all relevant factors including:

(1) The relative earnings and earning capacities of the parties.

7. In her Pre-hearing Memorandum, appellant stated that she was enrolled for a four-year college program to gain employable skills, and requested alimony in the amount of $125.00 per week for a period of four years.

(2) The ages, and the physical, mental and emotional conditions of the parties.

(3) The sources of income of both parties including but not limited to medical, retirement, insurance or other benefits.

(4) The expectancies and inheritances of the parties.

(5) The duration of the marriage.

(6) The contribution by one party to the education, training or increased earning power of the other party.

(7) The extent to which it would be inappropriate for a party, because said party will be custodian of a minor child, to see employment outside the home.

(8) The standard of living of the parties established during the marriage.

(9) The relative education of the parties and the time necessary to acquire sufficient education or training to enable the party seeking alimony to find appropriate employment.

(10) The relative assets and liabilities of the parties.

(11) The property brought to the marriage by either party.

(12) The contribution of a spouse as homemaker.

(13) The relative needs of the parties.

(14) The marital misconduct of either of the parties during the marriage; however, the marital misconduct of either of the parties during separation subsequent to the filing of a divorce complaint shall not be considered by the court in its determinations relative to alimony.

A glaring inequity is immediately perceived from the first factor, relative earnings and earning capacities. At the time of the master's hearing, appellee was employed as a laborer for Garden State Tannery and earned $18,000.00 per year gross income, or $13,000.00 per year net income. *See* Income and Expense Statement of Appellee. In contrast, appellant's yearly income was about $3,300.00 gross or

$2,770.00 net. Neither party had an exhibited capacity to increase these earnings.[8]

As to the second factor, appellant was born in 1936, and appellee in 1935. The master attributed no significance to this factor since he found the ages, physical, mental, and emotional conditions to be equal for both parties. Although appellant alluded to a problem with her nerves, and her doctor testified to her infected dermititis, these problems did not seem to be serious.

Similarly, the master found no significance in the third factor: income from medical, retirement, or other benefits. The only major source of income in this category was appellee's pension. Since the master recommended that the pension benefits be divided equally, he attached no significance to this factor. Although the lower court remanded the pension issue to the master for further hearings, its concern seemed to be with the method of distribution rather than with the relative division.

The fourth factor involves the expectancies and inheritances of the parties, which were not applicable in this case.

The master found that the fifth factor, duration of the marriage, appeared to *favor* the granting of alimony. However, the master then went on to state that since the parties were on an equal basis financially, the effect of this factor favoring alimony was counter balanced. Because I would find that the parties were *not* on an equal basis financially, the effect of this factor favoring alimony would not be mitigated.

The sixth and seventh factors are not pertinent to the situations of the parties here, and the master so specified.

The eighth factor concerns the standard of living established by the parties during the marriage. The master described the standard of living achieved as "adequate", and concluded that both parties would be able to maintain such standard of living. I disagree with this conclusion.

8. Even if appellant quadrupled her dog grooming business, there would still be a significant difference between her earnings and those of appellee.

While the appellee is able to maintain an adequate standard of living on $13,000.00 per year, appellant's income of only $2,770.00 per year could not ensure even a subsistence standard of living. I feel that this factor would strongly militate in favor of an alimony award.

The master afforded no weight to the ninth factor, the relative education of the parties and the time necessary for further education or training to enable the party seeking alimony to find appropriate employment. The master determined that there was no disparity in the relative education of the parties, and that appellant would not require additional education or training to enable her to find appropriate employment. Since I would not find that appellant's dog grooming business constituted appropriate employment, and since she would have difficulty entering the general job market without additional education or training, this factor would also suggest a temporary grant of alimony.

The master found no significant variance between the parties as to assets and liabilities, the tenth factor. The marital home was the major consideration in this category, and upon sale would provide roughly $32,000.00 to each party. I note that this asset to appellant will be offset by her increased living costs. Furthermore, appellant should not be expected to completely dissipate her assets. *See Kuhn v. Kuhn*, 25 D & C 3d 234 (1982). Thus, this asset is not so substantial as to enable appellant to provide for her reasonable needs.

No property was brought to the marriage by either party, and so the eleventh factor is inapplicable.

The twelfth factor, the contribution of a spouse as homemaker, was resolved by the master in favor of appellant. It was not disputed that appellant was fully responsible for the care of the home. The master felt that appellant's homemaking contribution was reflected by the equitable distribution of the marital resident, and apparently found that, consequently, it need not be considered in a determination of alimony. I dispute this analysis—many of the factors considered in equitable distribution also pertain to a consideration of alimony. This does not mean that consider-

ation of such a factor under one award precludes its consideration under a different award. Thus, appellant's contribution as homemaker should weigh in favor of alimony.

The master found that the relative needs of the parties, factor thirteen, were generally well-balanced. We note that neither party had inordinate expenses.

The final factor, marital misconduct prior to separation, was discounted by the master who stated that the testimony in this regard was not sufficient to affect the determination of alimony. The appellee admitted, however, that he was seeing another woman prior to the filing of the complaint and separation. N.T. August 11, 1981, at 36. (Appellee testified that Katherine Eichert had been his "girlfriend" since February 27, 1980. The complaint was filed on May 14, 1980, and the parties separated thereafter.) This testimony certainly indicates appellee's marital misconduct, and should weigh in favor of appellant's claim for alimony.

On the whole, therefore, many of the 23 § 501(b) factors strongly signify that rehabilitative alimony to appellant is appropriate. None of the remaining factors detract from this indication. Accordingly, I would hold that the trial court abused its discretion in denying appellant's claim for alimony.