is not analyzed or explained by the court. As to the child's best interests, which the trial court acknowledged it was to consider, the court states only that they will be served by Mother. There are no findings of fact, no analysis of the evidence, and no explanation as to why and how the trial court determined that Maayan's best interests would be served by primary custody in Mother.

"[S]ince our broad scope of review does not vest this court with the duty or the privilege of making our own independent custody determination," remand to the lower court is our only option. *Artzt v. Artzt, supra,* 383 Pa.Super. at 26, 556 A.2d at 411. While we are loathe to delay resolution of this matter, and do so only in rare instances, our review of the record and the trial court's "opinion" allows for no other alternative. We are offered neither guidance as to the credibility of the witnesses nor the court's findings about Father's credibility when he testified Maayan was inadequately supervised during Mother's periods of physical custody. "We have often noted that the hearing judge is in a far superior position to determine matters of credibility, and to evaluate the attitude and sincerity of the witnesses." *In re Custody of White,* 270 Pa.Super. 165, 411 A.2d 231, 233 (1979). The trial court did not comment on any of the allegations Father made regarding Mother's supervision of Maayan, made no mention of the suitability of either party as a primary caretaker, and failed to comment on Mother's suitability for primary custody in light of her admitted status as an illegal alien.[1]

A trial court opinion must reveal to the appellate court that the lower court conducted a thorough analysis of the record. We are unable to glean any reasons, let alone specific ones, for the trial court's decision. There is no way for us to determine what the *deciding factors* were for the *trial court's* decision, nor can we determine if the court attached any weight to any of the testimony offered by either of the parties.

We are constrained to conclude that we must remand this case. While the present record may provide a sufficient basis for a comprehensive opinion, we do not limit the ability of either party to request, or the lower court's discretion to require, a further hearing. *See Kimmey v. Kimmey,* 269 Pa.Super. 346, 409 A.2d 1178 (1979).

Order reversed. Case remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.

P.C.S.

v.

J.E.B.

v.

R.A.S.

**Appeal of J.E.B., Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 31, 1995.

Filed June 8, 1995.

Reargument Denied Aug. 8, 1995.

---

1. The court's only statement in this regard is that it was trying a custody matter, not conducting an immigration hearing. Such a conclusion, which was apparent in the court's attitude throughout the custody hearing, has nothing to do with whether the court must consider such evidence in analyzing how this child's interests will best be served.

Steven Howell, Carlisle, for appellant.

Michael R. Rundle, Carlisle, for P.C.S., appellee.

William C. Vohs, Carlisle, for R.A.S., appellee.

Before TAMILIA, HUDOCK, and FORD ELLIOTT, JJ.

FORD ELLIOTT, Judge:

Appellant comes before us challenging an order entered in the support action below, July 18, 1994, directing blood testing of all relevant parties pursuant to 23 Pa.C.S.A. § 5104. For the purposes of both confidentiality and convenience, we shall refer to the various parties as follows: plaintiff/appellee, P.C.S., shall be "Wife;" additional defendant/appellee, R.A.S., shall be "Husband;" and defendant/appellant, J.E.B., shall be "Putative Father." Upon careful review of the issues raised on appeal by Putative Father, we affirm.

The facts underlying this appeal bear review. Husband and Wife were married September 19, 1981. A child was born to Husband and Wife on October 31, 1985, and is not the subject of these proceedings. In July 1989 Husband underwent a vasectomy procedure. Thereafter, until July 1992, Husband and Wife engaged in regular sexual intercourse without benefit of any other form of contraception. Wife did not conceive during this time. Husband and Wife separated in mid-July 1992, and Husband moved out of the marital residence.

In August 1992, Wife began a sexual relationship with Putative Father, whom she had known since 1986. Wife and Putative Father engaged in sexual intercourse several times during August and continued until a reconciliation between Husband and Wife occurred

during the first week of September 1992. Husband then moved back into the marital residence. We note that testimony was adduced that Husband and Wife engaged in sexual relations during the period of separation. Notes of testimony, 7/11/94 at 240. Wife first learned that she was pregnant on September 15, 1992.[1] It is this child that is the subject of the instant support action.

On September 29, 1992, Husband underwent, for the first time, a fertility test which verified that he was infertile. Husband continued to reside with Wife, but eventually filed for divorce February 9, 1993. The child that is the subject of this support action was born May 19, 1993. The divorce between Husband and Wife was finalized May 27, 1993. Husband continued to reside with Wife until approximately July 13, 1993, at which time he moved from the household. Husband removed himself from the household when it became clear that Wife would not give up the subject child for adoption. Notes of testimony, 7/11/94 at 21–22.

On appeal, the Putative Father raises multiple arguments which may effectively be couched as three distinct issues:

1. Has the presumption that a child born during a marriage is a child of that marriage been overcome by clear and convincing evidence?

2. Are Husband and/or Wife estopped from asserting paternity outside of the marriage?

3. Have Husband and Wife effectively admitted the paternity of Husband by failing to respond to Putative Father's Request for Admissions, pursuant to Pa.R.C.P. Rule 4014(b)(d), 42 Pa. C.S.A.?

We shall address these matters *seriatim*.

■ Putative Father's first and second issues challenge the ability of the trial court to order blood testing of the respective parties pursuant to 23 Pa.C.S.A. § 5104. We begin our discussion of Putative Father's first issue by observing that one of the strongest presumptions known to our law is that a child born to a married woman is a child of the marriage. *John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380 (1990), *cert. denied*, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990); *Kohler v. Bleem v. Kohler*, 439 Pa.Super. 385, 654 A.2d 569 (1995); *McCue v. McCue*, 413 Pa.Super. 71, 604 A.2d 738 (1992), *allocatur denied*, 531 Pa. 655, 613 A.2d 560 (1992). Blood testing may not be used to rebut this presumption in the first instance; rather, the presumption must first be rebutted by other clear and convincing evidence. *McCue, supra.*

Putative Father relies on various case precedents for the proposition that this presumption can only be overcome by clear and convincing proof of either *non-access* or *impotency*, citing, *inter alia*, *Jones v. Trojak*, 535 Pa. 95, 634 A.2d 201 (1993). We agree, generally, with this proposition. However, Putative Father goes on to contend that the impotency prong for rebutting the presumption is restricted to meaning incapacity for sexual intercourse. Putative Father derives his definition of impotency from *Manbeck v. Manbeck*, 339 Pa.Super. 493, 489 A.2d 748 (1985), an appeal from a divorce action in which the marriage was annulled because of the *wife's* "impotency" (incapacity for sexual intercourse). Putative Father's argument concludes that since Husband and Wife admit to sexual intercourse before and during the time of conception, obviously *impotency* has not been proven by any evidence, clear, convincing, or otherwise. We disagree.

■ Putative Father misperceives our case law. Although many cases do speak of rebutting the presumption of paternity by clear and convincing evidence of *non-access* or *impotency*, we do not believe that our precedents mean to restrict the impotency prong to impotency *per se*. We believe that our cases actually intend impotency to refer also to an inability to procreate. This can be readily shown by reciting to precedent ourselves:

> This presumption (which we will henceforth refer to as the presumption that a child born to a married woman was the

---

1. The notes of testimony employ the date September 15, 1993. See notes of testimony, 7/11/94 at 7. It is apparent from all other testimony and the rest of the record, however, that this date should have read 1992.

child of that marriage) could traditionally be overcome only by proof that the husband did not have access to his wife during the period of possible conception, or by proof of the husband's impotency or sterility.

*John M. v. Paula T.* at 313–14, 571 A.2d at 1384 (citations omitted).

'Traditionally, that presumption could be rebutted only by proof that a husband was incapable of procreation or had no access to his wife during the relevant period.'

*McCue v. McCue, supra* at 75, 604 A.2d at 740 (citations omitted). Thus, we find no merit to Putative Father's argument. The presumption can be rebutted by clear and convincing evidence of sterility or an inability to procreate. We believe that a vasectomy, where the operation's success is confirmed by a sperm count analysis, qualifies as clear and convincing evidence of an inability to procreate.

■ Obviously, anticipating this conclusion, Putative Father also raises the argument that a post-conception fertility test cannot be used to verify the results of a vasectomy. Putative Father recites *Bohn v. Lunger*, 340 Pa.Super. 369, 490 A.2d 465 (1985), for this proposition. In *Bohn* the trial court refused to allow the defendant to introduce medical testimony that he was found aspermatic during a test performed four months after the birth of the child. The court ruled the test irrelevant because it did not indicate the defendant's condition at the time of conception. The court also indicated evidence casting doubt on whether defendant ever underwent a vasectomy.

We do not find *Bohn* to apply. First, although clearly the instant fertility test was performed after conception,[2] it was performed near enough to the time of conception to be probative. Second, we also note that additional evidence was presented that Husband and Wife engaged in unprotected sexual relations for many months following Husband's vasectomy and yet Wife failed to conceive. This also indicates that Husband's vasectomy operation was successful. We do

not find that the court below was unjustified in regarding the presumption of paternity to have been rebutted by clear and convincing evidence.

■ We also do not find that Husband and Wife are estopped from denying Husband's paternity as Putative Father contends in his second argument. Putative Father's second argument is predicated on another well-established line of cases which hold that even where the presumption of paternity might otherwise be overcome, the parties will nevertheless be estopped from doing so under certain circumstances:

However, under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as the father of the child. *John M.*, 524 Pa. at 318, 571 A.2d at 1386. These estoppel cases indicate that where the principle is operative, blood tests may well be irrelevant, for the law will not permit a person in these situations to challenge the status which he or she has previously accepted. *Id.* However, the doctrine of estoppel will not apply when evidence establishes that the father failed to accept the child as his own by holding it out and/or supporting the child. *Christianson*, 390 Pa.Super. at 409, 568 A.2d at 966. Only when the doctrine of estoppel does not apply will the mother be permitted to proceed with a paternity claim against a putative father with the aid of a blood test.

*Jones v. Trojak, supra* at 105–06, 634 A.2d at 206. *See also Christianson v. Ely*, 390 Pa.Super. 398, 568 A.2d 961 (1990).

Putative Father lists the following factors as indicative that Husband and Wife have held themselves out as the parents of the subject child:

First, Husband and Wife resided together is [sic] a jointly owned marital residence at the time of the child's conception in August 1992 and at the time of his birth in May 1993. (R. 29a, R. 61a, R. 218a). Second, Husband and Wife engaged in sexual inter-

---

**2.** Wife learned she was pregnant on September 15, 1992, and Husband was tested September 29, 1992.

course in August 1992. (R. 61a, R. 239a, R. 240a). Husband testified that he and his wife engaged in sexual intercourse at least three to four time [sic] from July 17, 1992 through September 5, 1992. (R. 239a and R. 240a). Third, Husband and Wife remained in the same marital household from the time of conception in August 1992 up through and including July 13, 1993. (R. 61a). Fourth, during the pregnancy and for two months after the child's birth, Husband testified that he paid most of the household expenses including the mortgage, food and utilities. (R. 219a, R. 244a, and R. 245a). Fifth, Husband and Wife admit that they reconciled their marital difficulties after both knew of the Wife's pregnancy. (R. 218a, R. 229a, R. 223a, R. 242a, and R. 243a). Sixth, the child shares the same middle initial and last name as that of the Husband and older sibling. Seventh, Husband remained in the marital home with his Wife after his wife informed him of the pregnancy and after he learned the results of the post-conception sperm test. (R. 61a, R. 242a, R. 243a). Finally, Husband and Wife did not separate until July 13, 1993, almost two months after the child's birth. (R. 29a, R. 61a, R. 213a, R. 214a). These facts indicate an intact marriage at the time of the child's conception in August 1992.

Putative Father's brief at 22–23. We disagree that these factors indicate that Husband and Wife accepted the subject child as Husband's.

All but one of the listed factors describe events and conditions that pertain more to the nature of the relationship between Husband and Wife rather than their relationship vis-a-vis the subject child. The Sixth factor is the only one that could, with the addition of certain information, support a finding of estoppel. However, we find this factor to be sufficiently rebutted by additional evidence.

Arrayed against Putative Father's position are a host of factors indicating that neither Husband nor Wife ever maintained that Husband was the subject child's father. During her pregnancy, Wife told friends and co-workers that the child was Putative Father's. Notes of testimony, 7/11/94 at 26. In their

separation agreement, appended to and made a part of their divorce decree, Husband and Wife named Putative Father as the biological father of the subject child. Notes of testimony, 7/11/94 at 10. Putative Father was named as the biological father on the subject child's birth certificate. Notes of testimony, 7/11/94 at 11–12. Wife's medical insurance paid for the subject child's birth expenses. Notes of testimony, 7/11/94 at 13. Wife filed for child support against Putative Father following the birth of the subject child. Notes of testimony, 7/11/94 at 25. Furthermore, rather than exhibiting an attitude of acceptance and acknowledgment, Husband clearly found the subject child objectionable. We note the following testimony by Wife:

> As far as my family goes, they knew the situation behind—they knew that Rick [Husband] wanted me to have an abortion or give the child up for adoption. They knew I wouldn't. And they knew the tension between us and his inability to accept my pregnancy state. And it was uncomfortable.

Notes of testimony, 7/11/94 at 20. And later:

> During my pregnancy with [the subject child] I was considering abortion. And halfway through I knew I couldn't. I was considering giving [the subject child] up for adoption. And he [Husband] did not leave the residence until he knew I wouldn't give [the subject child] away.

Notes of testimony, 7/11/94 at 21–22. It seems clear to us that Husband and Wife never acknowledged the subject child as Husband's offspring.

■ We may quickly dispose of Putative Father's final argument. Therein, Putative Father asserts that Husband and Wife must be deemed to have admitted facts that preclude their denial of Husband's paternity by their failure to timely respond to a Request for Admissions. We disagree.

The parties are contesting the application of the following Rule of Civil Procedure which reads, in pertinent part:

(b) Each matter of which an admission is requested shall be separately set forth. The matter is admitted unless, within thirty days after service of the request,

or within such shorter or longer time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission an answer verified by the party or an objection, signed by the party or by his attorney; but, unless the court shortens the time, a defendant shall not be required to serve answers or objections before the expiration of forty-five days after service of the original process upon him....

Pa.R.Civ.P. Rule 4014(b), 42 Pa.C.S.A.

Instantly, Putative Father filed his Request for Admissions as to Wife on January 10, 1994. Wife answered by filing a Response on February 17, 1994. Putative Father filed his Request for Admissions as to Husband on March 15, 1994. Husband never responded.

Rule 4014(b) does not set an absolute deadline date for filing answers to requests for admissions. Rather, it sets a tentative date of thirty days following service of the request, *"or within such shorter or longer time as the court may allow."* In the case before us, Wife filed her Response on the thirty-eighth day following service (and this assumes that service of the Request was had on the same day as its filing). No objection was raised to Wife's "late" filing during trial, nor was any averment contained in her Response directly challenged as having been already admitted. Moreover, the court clearly adopted some of the positions taken in the Response rather than in the Request for Admission.[3] The conclusion that we draw from these facts is that the trial court effectively accepted Wife's Response filed on the thirty-eighth day and thus allowed "such longer time" as prescribed under Rule 4014.

Further, as Wife correctly indicates, any Admissions arising from Husband's failure to respond to the Request for Admissions directed toward him cannot be imputed to Wife because Wife and Husband are separate parties with disparate interests. *See Frazier v. Commonwealth of Pennsylvania, State Retirement Board,* 17 Pa.Cmwlth. 243, 331 A.2d 596 (1975).

As for the unanswered Request for Admissions that was directed to Husband, we find ourselves in agreement with the trial court; Putative Father should have lodged his objection before lengthy testimony contradicting the Admissions was taken at trial. *See* notes of testimony, 7/11/94 at 60–62. As soon as objectionable testimony was offered, Putative Father should have objected on the basis that an Admission declared otherwise. In failing to do so, Putative Father waived any such objection both then at trial and now on appeal. We have previously stated: "We will not consider a claim on appeal which was not called to the trial court's attention at a time when any error committed could have been corrected." *Noecker v. Johns–Manville Corporation,* 355 Pa.Super. 463, 471, 513 A.2d 1014, 1018 (1986). In short, we find the facts underlying this case to be as they were adduced at trial, and as they were found by the trial court, and not as they were purported in Putative Father's Request for Admissions.

Accordingly, the order below is hereby affirmed. Jurisdiction relinquished.

---

**3.** For example, the Response denied that Husband was capable of procreation.