690 A.2d 1171

**RUTH F.**

**v.**

**ROBERT B., Jr., Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 4, 1996.

Filed Feb. 6, 1997.

400

Michael Fiffik, Pittsburgh, for appellant.

Carol L. Hanna, Bethel Park, for appellee.

Before CAVANAUGH, J., CIRILLO, President Judge Emeritus, TAMILIA, KELLY, JOHNSON, FORD ELLIOTT, SAYLOR, EAKIN and SCHILLER, JJ.

TAMILIA, Judge.

Robert B., Jr., putative father of Zachary F., appeals from the May 9, 1995 Order directing him, along with Zachary and appellee/mother, Ruth F., to submit to blood testing for the purpose of determining Zachary's paternity. At the time of conception of Zachary and until 1992, a period of more than three years, mother lived with Zachary's presumptive biological father, David F., as man and wife in an intact family relationship. Ruth and David F. separated in August, 1992, and divorced in December, 1993. As part of the divorce agreement, the parents agreed that husband would support the two older children he fathered during the marriage but not Zachary. Preliminarily, we find this agreement a nullity as parents may not bargain away the rights of their children to support. *Hyde v. Hyde*, 421 Pa.Super. 415, 618 A.2d 406 (1992).

The issue squarely presented by this appeal is whether mother is estopped from denying the paternity of the presumptive father, David F., and pursuing a paternity and support action against the putative father, Robert B., Jr. The

trial court, after review of ex parte testimony by the mother before a court-appointed hearing officer, affirmed the finding of the hearing officer that the mother overcame the presumption of legitimacy because of non-access and that the behavior of the presumptive father, David F., and/or herself was insufficient to establish an estoppel. Based upon this finding and conclusions drawn from the mother's testimony, the trial court authorized blood testing of the mother, son Zachary and appellant.

We believe the trial court was in error. The Order must be vacated and the support action against Robert B., Jr., must be dismissed with prejudice.

■ The law in Pennsylvania as to estoppel in determining the legal relationship between a married man and woman and a child conceived during the marriage is well established, clearly stated and easily applied. From time to time, there arise nuances in fact situations which confuse the application of the doctrine, but these invariably give way to a careful application of policy considerations and time-honored standards of proof. This is such a case. Initially, despite attempts in recent times to insinuate otherwise and the advent of modern technology by discovery of almost incontrovertible means of proving paternity through genetic, HLA and DNA testing, the resolution of the issue of paternity is determined by behavior, conduct and intent during a particular period of time. This determination is unaffected by performance of or demand for blood tests, which are irrelevant to the issue.

■ The right to obtain a blood test to determine paternity is established by Pa.R.C.P. 4010, **Physical and mental examination of persons,** and/or rule 1915.8, **Physical and mental examination of persons,** when the paternity is in controversy. The Order may be made only on motion for good cause shown. *John M. v. Paula T.,* 524 Pa. 306, 571 A.2d 1380 (1990). In a case where the custody or support of a child conceived during marriage is at issue, and this turns on the parentage of the child by the husband/father, the presumption of legitimacy of the child must effectively be rebutted before there is good

cause to permit the grant of the motion for a blood test. "The 'presumption of legitimacy' arose from the reluctance of the law to declare a child illegitimate, because the status 'illegitimate' historically subjected a child so labeled to significant legal and social discrimination." *Id.* at 312 n. 2, 571 A.2d at 1383 n. 2 (citations omitted).

■ This case turns on whether the presumption of legitimacy has been rebutted, which in turn is conditioned upon whether the parties are estopped from relying on evidence leading to rebuttal of the presumption of legitimacy. The law of Pennsylvania has evolved to the point that paternity may be established for all purposes, when legitimacy is in question, in one of several ways.

The General Assembly has codified the principle of "paternity by estoppel" in its Act of June 17, 1971, P.L. 175, No. 17, § 1, *as amended* by Act of November 26, 1978, P.L. 1216, No. 288 § 1, 48 Pa.Stat.Ann. § 167 (Purdon's Supp. 1989) (hereinafter referred to as "section 167"), which provides:

**Children; legitimacy; determination of paternity**

(a) Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same, That all children shall be legitimate irrespective of the marital status of their parents and in any and every case where children are born out of wedlock they shall enjoy all the rights and privileges as if they had been born during the wedlock of such parents, except as otherwise provided in Title 20 Pa.C.S.

(b) For purposes of prescribing benefits to children born out of wedlock by, from and through the father, paternity shall be determined by any one of the following ways:

(1) If the parents of a child born out of wedlock shall have married each other.

(2) *If during the lifetime of the child, the father openly holds out the child to be his and receives the child into*

*his home, or openly holds the child out to be his and provides support for the child which shall be determined by clear and convincing evidence.*

(3) If there is clear and convincing evidence that the man was the father of the child which may include a prior court determination of paternity.

*John M., supra* at 318–319, 571 A.2d at 1386–1387 (emphasis in original). The highlighted portions of the above statute clearly apply to the facts of this case.

The evidence detailed at the proceeding before the hearing officer is clear and convincing of the parental commitment and involvement of David F. with and on behalf of Zachary. The hearing officer and trial court willingly accepted a revisionist view of the facts to which the mother testified and which were uncontradicted by David F., as he was not present. In its memorandum, the court states: "It is well settled that paternity-by-estoppel operates against a husband only if, *from the time he became reasonably aware of his non-paternity,* he continues to accept parental responsibility for the child and hold the child out as his own." (Memorandum, Kaplan, J., 5/9/95, p. 5; citations omitted.) In this case, the trial court found husband did not become reasonably aware of his non-paternity until May, 1992, when the mother finally told him the truth of Zachary's paternity.

Despite the fact the husband was not present and the testimony of the mother was self-serving, it became clear on cross-examination of the mother that the husband had been aware of the likelihood that some other person fathered Zachary. At the outset, according to appellee, she and Mr. F. had not had intercourse during several months covering the period of conception, although still married. Previously having fathered two other children during this union and with the knowledge of the normal term of a pregnancy, Mr. F. could be expected to question his paternity and to be reasonably sure that Zachary was not fathered by him. On cross-examination, Mrs. F. responded as follows:

Q. And you did, however, indicate that [Mr. F.], from the early years of the child's life with you suspected that the child was not his; is that correct?

A. Yes.

Q. And he continued, however, to treat the child as his own and raise the child as one of his children?

A. Yes.

(H.T., 9/7/94, pp. 8–9.) And later in the questioning, Mrs. F. acknowledged that from the child's early years Mr. F. said the child was not his and that it was an ongoing contention in the marriage (*id.* at 13). Notwithstanding, they both maintained a family relationship, treated Mr. F. as the father and to this day, seven years after birth, Zachary believes Mr. F. to be his father. On her own, appellee decided to repudiate the relationship, telling Mr. F. he was not the father in May, 1992, which was followed by a voluntary blood test which excluded him as the father.

This exchange is telling and convincing that Mr. F., under any definition of a discovery rule that might be applied to this case, did or should have known of his non-paternity and yet failed to take any purposeful steps to exculpate himself from the responsibility he had undertaken. Rather, the evidence is clearly to the contrary—Zachary was born into an intact family on June 7, 1989, and for the next three years Mr. F. held the child out as his own, supporting him financially as well as emotionally. "[David F.]" was listed on Zachary's birth certificate as his father; Mr. F. included Zachary on his medical plan and regularly claimed him as a dependent on the family's tax returns. In addition, the mother testified (as corroborated by testimony of Mr. B.) that in either late '91 or early '92 (well before the separation in October, 1992 or "disclosure" in May, 1992), Mr. F. met with appellant Robert B. and proposed a transfer to Mr. F. of a piece of property as financial compensation to set at rest any paternity claims against appellant. Mr. B. refused. In the spring and summer of 1992, appellee brought things to a head by declaring that Robert B. was the father. Despite Mrs. F.'s desire to continue as a family unit, in order to retaliate against her and Mr.

B., Mr. F., in October, 1992, filed a support action against Mr. B. and Mrs. F. on behalf of Zachary. The complaint was dismissed because of the estoppel principle and no appeal was taken by Mr. F. It appears that dismissal by Judge Kaplan in that action resolved the paternity issue as to Mr. F.'s paternity on the basis of estoppel. Also, as to the issue of paternity, the principle of res judicata prevents any action by Mrs. F. against Mr. B.

> Where parties have been afforded an opportunity to litigate a claim before a court of competent jurisdiction, and where the court has finally decided the controversy, the interests of the state and of the parties require that the validity of the claim and any issue actually litigated in the action not be litigated again.

*Ham v. Sulek,* 422 Pa.Super. 615, 621–622, 620 A.2d 5, 8 (1993). Regardless of whether the plaintiff effects a recovery in the first action, he [or she] may not relitigate an action which has once been adjudicated. 46 AmJur.2d, Judgments § [524].

Application of the doctrine of res judicata requires that the two actions possess the following common elements: (1) identity of the thing sued upon; (2) identity of the cause of action; (3) identity of the parties; (4) identity of the capacity of the parties. *Matternas v. Stehman,* 434 Pa.Super. 255, 261, 642 A.2d 1120, 1123 (1994); *McArdle v. Tronetti,* 426 Pa.Super. 607, 612, 627 A.2d 1219, 1222 (1993), *allocatur denied,* 537 Pa. 622, 641 A.2d 587 (1984) [ (1994) ]; *Banker v. Valley Forge Ins. Co.,* 401 Pa.Super. 367, 373–374, 585 A.2d 504, 508 (1991), *allocatur denied,* 529 Pa. 615, 600 A.2d 532 (1991).

*Id. [Dempsey v. Cessna Aircraft Co.,* 439 Pa.Super. 172] at 174–78, 653 A.2d [679] at 680–81 [ (1995) ]. See also: *Hammel v. Hammel,* 431 Pa.Super. 230, 237–239, 636 A.2d 214, 217–218 (1994); *Morgan Guar. Trust Co. v. Staats,* 428 Pa.Super. 479, 491–493, 631 A.2d 631, 367–638 (1993).

Principles of res judicata are also applicable to determinations of paternity. See: *Wachter v. Ascero,* 379 Pa.Super. 618, 550 A.2d 1019 (1988); *Gardner v. Gardner,* 371 Pa.Su-

per. 256, 538 A.2d 4 (1988), *allocatur denied,* 521 Pa. 605, 555 A.2d 115 (1989); *Manze v. Manze,* 362 Pa.Super. 153, 523 A.2d 821 (1987); *Shindel v. Leedom,* 350 Pa.Super. 274, 504 A.2d 353 (1986); *R.J.K. v. B.L.,* 279 Pa.Super. 71, 420 A.2d 749 (1980); *Commonwealth ex rel. Nedzwecky v. Nedzwecky,* 203 Pa.Super. 179, 199 A.2d 490 (1964).

*Scott v. Mershon,* 441 Pa.Super. 551, 657 A.2d 1304 (1995).[1] Notwithstanding the res judicata finding, we believe a full discussion of the remaining issues will facilitate the resolution of cases such as this by the courts.

 While this case was treated at the outset as an estoppel case as to the presumptive father, it actually turns on whether or not the mother is estopped from denying the legitimacy of Zachary. The facts are incontrovertible as to the mother. In fact, at oral argument mother's attorney said the parties agreed there was non-access between Mrs. F. and her husband at the time of conception and that she knew Mr. B. was the only other likely biological parent. Additionally, Mrs. F. kept the family intact, allowed the husband to exercise and fulfill the role of father for over three years, and even now, at seven years of age, Zachary believes Mr. F. is his father. The time during which the concept of intact family attaches is at the time of birth and the years thereafter during which the parents treat the child as a member of the family unit. The dissolution of the marriage in 1992–1994 had no bearing on the intact status of the family for purposes of estoppel, and once the mother, with irrefutable knowledge of the child's paternity, manifests the intent and conducts herself in a manner leading her husband, the child and the world to treat Zachary as a child of the marriage, she is estopped from denying the parentage of the child now that she wishes to end the marriage and believes a better provider of support would be Mr. B.

In a recent Superior Court case referencing *Jones v. Trojak,* 535 Pa. 95, 634 A.2d 201 (1993), we reasoned:

1. While this issue was neither briefed on appeal nor raised in the court below, since it effects the jurisdiction of this Court to dispose of the matter, we may determine the issue sua sponte.

*Jones* teaches that this Commonwealth has a concern for the "family unit." The existence of this "unit" is created where the presumed father assumes a parenting role in the life of the child and begins the development of, what is hoped to be, a lifelong bond. While the marriage of mother and husband may ultimately falter, where a parent-child relationship has developed, the Commonwealth's interest in maintaining this relationship remains, as will the presumption that the child is a child of the marriage. However where no "family unit" has ever existed because husband has not taken on the role as parent to the child, the preservation of a "family unit" is not at issue in resolving paternity matters. Where a parent-child relationship has never existed and husband has not taken on the role of parent to the child, the purpose of the presumption, which is to preserve an existing relationship, is no longer served. Therefore critical to a resolution of any paternity claim is a determination of the relationship of the parties based upon the facts.

*Dettinger v. McCleary*, 438 Pa.Super. 300, 304, 652 A.2d 383, 385 (1994); *see also Kohler v. Bleem*, 439 Pa.Super. 385, 405, 654 A.2d 569, 579 (1995) (Tamilia, J., dissenting), *alloc. denied*, 541 Pa. 652, 664 A.2d 541 (1995) ("The concept of an intact family which the law seeks to protect is the family as it exists at the time of conception or birth of the child (not at the time of separation)".).

The resolution of this case is governed by *Christianson v. Ely*, 390 Pa.Super. 398, 568 A.2d 961 (1990), and *Seger v. Seger*, 377 Pa.Super. 391, 547 A.2d 424 (1988), which hold that the doctrine of paternity by estoppel may also be applied to the mother who holds her husband out to be the child's father. *Accord, Adoption of Young*, 469 Pa. 141, 364 A.2d 1307 (1976), and *John M., supra*. The trial court, in an inversion of the rule, considered testimony of non-access when it ignored the estoppel of the mother from testifying to non-access due to the holding out and treating the child as that of the husband despite knowledge that he was not. The trial court's finding that the mother concealed the truth of Zachary's paternity

from the husband is belied by testimony of the mother and the actions of the father detailed above. The holding out of the child as his own was established by clear and convincing evidence and evidence of husband's lack of knowledge was not convincing, but rather leads to a fair conclusion that he had reasonable information regarding another person's paternity. If holding out must be established by clear and convincing evidence, it is reasonable that in the face of such evidence lack of knowledge of the questionable paternity must be equally established by clear and convincing evidence. The reliance on *Kohler, supra,* by the trial court is misguided. In *Kohler,* the alleged lack of knowledge of the specific identity of the person fathering the child (as opposed to the knowledge the husband could not have fathered the child because he had a vasectomy) was the basis upon which the majority allowed testimony to rebut the presumption of legitimacy created by the estoppel doctrine. The *Kohler* Opinion has not changed the law of parental estoppel but turns on unique facts not applicable here. Here, the husband knew the putative father because he attempted to make a deal with him to obtain property in exchange for continued support of the child while the family was still intact.

In the case of *In the Matter of Baby M.,* 109 N.J. 396, 537 A.2d 1227 (1988), in which the validity of a contract called a "surrogacy contract" was reviewed by the courts of New Jersey, the New Jersey Supreme Court stated:

> We invalidate the surrogacy contract because it conflicts with the law and public policy of this State. While we recognize the depth of the yearning of infertile couples to have their own children, we find the payment of money to a "surrogate" mother illegal, perhaps criminal, and potentially degrading to women.

*Id.* at 411, 537 A.2d at 1234. Here, any exchange of money property between the putative and presumed fathers to finalize paternity and/or support for Zachary would be likewise odious and demeaning to the nature of child care and responsibility in our society. We do not tolerate purchasing children for adoption and the bargaining over parenting rights and

duties as to Zachary in exchange for financial consideration is reprehensible. Any agreement reached thereby would have been unenforceable.

The trial court misstates the law when it finds: "The most significant factor in this case, however, was there was no intact family to protect and, therefore no reason to apply the estoppel." (Memorandum at 6.) Since in most paternity cases in which the estoppel doctrine is applied there has already been a separation or divorce complaint filed, the fact that the family is no longer intact is of little legal significance. The intact family which must be protected is the family from conception until the time the denial of paternity occurs, which can be one, two or even fifteen or sixteen years later. Despite dissolution of a marriage, certain aspects of most marriages, such as the ongoing relationship between siblings and that of the child to its parents, rights of inheritance, legal rights relating to insurance and accident claims, medical and hospitalization coverage and a myriad of other rights and duties derived from the status of parent and child, remain intact. It is these aspects which are also important considerations when the paternity doctrines are involved. The truth of this position is recognized by the trial court, which states the estoppel doctrine applies in only two instances— support actions where the father denies paternity and partial custody actions where the mother denies paternity. *Seger, supra,* and *In the Matter of Montenegro,* 365 Pa.Super. 98, 528 A.2d 1381 (1987). In both instances, the marriage is no longer intact but elements of the family remain intact. Thus, the trial court is inconsistent in his analysis of what constitutes an intact family and how it relates to the estoppel doctrine. A clear exposition of the doctrine and the policy reasons behind it were espoused in *Chrzanowski v. Chrzanowski,* 325 Pa.Super. 298, 472 A.2d 1128 (1994), which relies on the estoppel doctrine. Judge Beck, writing for the *Chrzanowski* panel, stated the policy behind this rule was best expressed in *Commonwealth ex rel. Gonzalez v. Andreas,* 245 Pa.Super.

307, 312, 369 A.2d 416, 419 (1976).[2]

Absent any overriding equities in favor of the putative father, such as fraud, the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized. Relying upon the representation of the parental relationship, a child naturally and normally extends his love and affection to the putative parent. The representation of parentage inevitably obscures the identity and whereabouts of the natural father, so that the child will be denied the love, affection and support of the natural father. As time wears on, the fiction of parentage reduces the likelihood that the child will ever have the opportunity of knowing or receiving the love of his natural father. While the law cannot prohibit the putative father from informing the child of their true relationship, it can prohibit him from employing the sanctions of the law to avoid the obligations which their assumed relationship would otherwise impose.

*Chrzanowski, supra* at 306, 472 A.2d at 1132, *quoting Gonzalez, supra.* In our gender-neutral society, this principle applies equally to the mother. Pennsylvania Constitution, Art. I, § 28, Equal Rights Amendment; 1 Pa.C.S. § 2301, Equality of rights based on sex.

The trial court in this matter goes on and attempts to justify the mother's actions and to relieve her of the implications of the estoppel doctrine in *her* interest and presumably in the child's best interest. These are not relevant considerations in what has been determined to be a public policy pronouncement of overreaching significance to a stable society, where the procreation and rearing of children are placed above the vacillating emotions and inconsistent objectives of the adults involved.[3]

**2.** Throughout this Opinion we have used the term putative father to mean the alleged biological father and presumptive father to mean the husband and legally recognized father. In *Commonwealth ex rel. Gonzalez v. Andreas,* 245 Pa.Super. 307, 369 A.2d 416 (1976), putative father is the presumptive father.

**3.** In *Scott v. Mershon,* 441 Pa.Super. 551, n. 2, 657 A.2d 1304, n. 2 (1995), Judge Wieand stated:

The trial court also would relieve the mother from the effect of the estoppel because the appellant participated in the child's creation and asked her to bear the child instead of terminating her pregnancy. All parties should be thankful for that result, however, the putative father has no standing to pursue custody or partial custody or to insist on payment of support, *see Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), which relieves the mother and the presumptive father of third party interference enabling them to go forward with treating Zachary as their child and to provide him the best that both have to offer. How could it possibly be in Zachary's best interest to force him into a relationship with a man whom he does not know, who denies any desire to support him or to become emotionally involved with him? Zachary's best hope is to remain in a relationship with his half-siblings, his mother and the man he believes is his father and who has treated him as a son for most of his early life.

The trial court admits that in either custody or support, as between either of them (husband and wife), each is estopped from denying paternity of the husband. The court cannot open the door to the wife as against the putative father when it is closed to him for custody purposes and closed to the husband for support purposes. This would create the anomaly that for this unique purpose, the law must recognize two legal fathers. This would be legally untenable and socially unacceptable. Blood tests to determine paternity become relevant and may be ordered only after the presumption of paternity has been overcome. *Jones v. Trojak*, 535 Pa. 95, 634 A.2d 201 (1993); *Zadori v. Zadori*, 443 Pa.Super. 192, 661 A.2d 370 (1995). In this case, that presumption has not been overcome because the mother is estopped from denying her husband's paternity. The trial court was in error in ordering appellant to submit to the blood test.

2. Whether the law, in this day of great medical and scientific advances, should continue to countenance the concealment of paternity in fact by a sometimes fictional presumption is a policy issue to be decided by the legislature and/or the Supreme Court.

Order reversed.

Jurisdiction relinquished.

Concurring Statement by CIRILLO, President Judge Emeritus.

EAKIN, J., concurs in the result.

Dissenting Opinion by JOHNSON, J.

Dissenting Opinion by SCHILLER, J., in which KELLY, J., joins.

Dissenting Statement by FORD ELLIOTT, J.

Concurring Statement by CIRILLO, President Judge Emeritus:

I agree with the result reached by the majority decision today. I write separately, however, to propose that our society has embarked upon an era in which the usefulness of the presumption of legitimacy as a legal tool must be questioned. Overcoming the presumption is fast becoming virtually impossible. Advancements in technology, in all its forms, medicine to air travel, have muddled clear and convincing rebuttal. The weakening rebuttal necessarily alters the substance of the presumption.

It is my opinion that the protection of the traditional family unit need not be dictated by the presumption; the protection of the family, where one exists, is the goal of the statutory and case law governing paternity. We need not cling to timeworn principles to support that goal. I believe a careful analysis of each factual situation, in particular the relationship between the presumptive or putative father and child, as well as the "known factor" of a putative father against whom a support claim may be made, is necessary to fair and just application of paternity law.

Dissenting Opinion by JOHNSON, Judge:

The Majority has concluded that Ruth F. is equitably estopped from denying that her ex-husband, David F., is the

father of her son Zachary. Because I believe that the proper resolution of this case requires the litigation of Zachary's paternity, I respectfully dissent.

Zachary F. was born on June 2, 1989. At the time of his birth, Zachary's mother, Ruth, was married to David F. Around the time of Zachary's conception, Ruth was engaged in an extra-marital affair with Robert B. At this same time, and for several months prior, Ruth and David had ceased marital relations. N.T., September 7, 1994, at 2–3; Trial Court Opinion, May 9, 1995, at 1–2.

Approximately one month into her pregnancy, Ruth informed Robert B. that he was the father of her child. N.T., *supra*, at 6. She also told Robert B. that she planned to abort the baby. Ruth abandoned this plan after Robert B. convinced her to have the child. *Id.;* Trial Court Opinion, *supra*, at 2. Evidence was also presented that Robert B. promised to "stand by" Ruth if she kept the baby. N.T., *supra*, at 6.

Throughout her pregnancy, however, Ruth represented to David that he was the child's father. *See* Trial Court Opinion, *supra*, at 2. During the first three years of Zachary's life, David and Ruth treated the child as a product of their marriage. *Id.* David was named as the child's father on his birth certificate and medical expenses related to the birth were paid by David's insurance. N.T., *supra*, at 8. David and Ruth also took exemptions on their joint income tax returns for Zachary. *Id.*

Once, early in Zachary's life, David did question whether he was the child's father. Trial Court Opinion, *supra*, at 2. In response, Ruth again told David that he was the father; David did not question Zachary's paternity again. *Id.* In June 1992, however, Ruth told David that he did not father Zachary. *Id.* The next month, at David's request, he, Ruth and Zachary submitted to blood tests to determine whether David had fathered Zachary. *Id.* The results excluded David as the child's natural father. *Id.* Since David has learned that he was not Zachary's father, he has stopped treating Zachary as his child. *See id.* at 3.

In August 1992, David filed a divorce action against Ruth; their divorce was completed in December 1993. In October 1992, David brought a support action against Robert B. on Zachary's behalf. The court dismissed that support action and David did not appeal.

Ruth brought the present support action against Robert B. in April 1994. The trial court ordered the parties to appear before a domestic relations hearing officer to determine whether Ruth was estopped from denying that David was Zachary's father. Order of Court, June 30, 1994. The hearing officer recommended that Ruth not be estopped from litigating Zachary's paternity and that the parties be required to submit to blood testing. Robert B. filed exceptions to this recommendation and this question was argued before the trial court. The court dismissed Robert B.'s exceptions and ordered Robert B., Ruth and Zachary to submit to blood testing to determine whether Robert B. was Zachary's father. Robert B. appealed and a divided panel of this Court reversed. The full Court then granted en banc certification to determine whether Ruth was estopped from denying that David had fathered Zachary.

Under Pennsylvania law, a child born to a married woman is presumed to be a child of her marriage. *John M. v. Paula T.*, 524 Pa. 306, 312–13, 571 A.2d 1380, 1383 (1990); *P.C.S. v. J.E.B.*, 442 Pa.Super. 388, 391, 659 A.2d 1043, 1045 (1995). This presumption can be overcome in two ways: (1) evidence of impotence by the husband; or (2) evidence of non-access or lack of sexual intercourse between husband and wife at the time of conception. *Jones v. Trojak*, 535 Pa. 95, 105, 634 A.2d 201, 206 (1993); *Commonwealth ex rel. Ermel v. Ermel*, 259 Pa.Super. 219, 221, 393 A.2d 796, 797 (1978). Even if a party successfully rebuts this presumption, the husband or wife may still be estopped from challenging paternity if that person, by his or her conduct, accepted the husband as the father of the child. *Jones, supra,* at 105, 634 A.2d at 206.

My first point of disagreement is with the Majority's recitation of the law governing this dispute. Specifically, I am troubled by the assertion that "whether the presumption of

legitimacy has been rebutted ... is conditioned upon whether the parties are estopped from relying on evidence leading to a rebuttal of the presumption of legitimacy." Maj.Op. at 403, 690 A.2d at 1173. This statement confuses two separate doctrines—the presumption of legitimacy and paternity by estoppel. The presumption of legitimacy arises when a child is born to a married woman. *P.C.S., supra,* at 391, 659 A.2d at 1045. Paternity by estoppel, on the other hand, bars one from challenging paternity if he or she has previously accepted and held out a person as a child's father. *Jones, supra,* at 105, 634 A.2d at 206. Thus, we determine whether the presumption of legitimacy applies by looking at *marital status;* we determine if paternity by estoppel applies by looking at the parties' *conduct.* That these are two separate concepts is further shown by the fact that paternity by estoppel may apply even where there is no presumption of legitimacy, and vice versa. *See Jefferson v. Perry,* 432 Pa.Super. 651, 656, 639 A.2d 830, 833 (1994) (stating that "principles of estoppel are peculiarly suited where the child is conceived out of wedlock and no presumptions regarding paternity apply."). Thus, the majority's statement of the law conflates these two separate inquiries. However, not only do I disagree with the Majority's statement of the law, I also disagree with its application of the law to the facts before the Court.

In this case, the trial court found as a fact that Ruth and David were not engaged in sexual relations at the time of Zachary's conception and thus held that the presumption of legitimacy was rebutted. Trial Court Opinion, *supra,* 1995, at 4–5. This finding was supported by Ruth's testimony. N.T., *supra,* at 2–3. This Court is bound by those findings of fact that are supported in the record. *See Stahli v. Wittman,* 412 Pa.Super. 281, 284, 603 A.2d 583, 584 (1992). Accordingly, I would affirm the trial court's holding that the presumption of legitimacy was rebutted by this evidence of non-access. *See Selm v. Elliott,* 411 Pa.Super. 602, 607 n. 2, 602 A.2d 358, 360 n. 2 (1992). The crucial question, therefore, is whether Ruth should be estopped from denying that David was Zachary's

father because she had held David out to be the child's father during the first three years of Zachary's life.

A mother who misrepresents her husband as the father of her child may later be estopped from challenging the child's paternity if the father accepts the child and treats him as his own. *See Jones, supra,* at 105, 634 A.2d at 206; *P.C.S., supra,* at 394, 659 A.2d at 1046; Joanne Ross Wilder, *Pennsylvania Family Law Practice and Procedure* § 27–4 (3d ed. 1993). This doctrine of paternity by estoppel is based on the notion that, under certain circumstances, it may be inequitable to allow a person to challenge a position that she previously adopted. *See John M., supra,* at 318, 571 A.2d at 1386. Under some circumstances, however, we may allow parties to challenge a position concerning paternity that they once accepted if the equities weigh in favor of such a challenge. *See Kohler v. Bleem,* 439 Pa.Super. 385, 654 A.2d 569 (2–1 decision), *appeal denied* 541 Pa. 652, 664 A.2d 541 (1995).

For example, in *Kohler,* a mother brought a support action against the putative father. The mother's husband had had a vasectomy prior to the marriage and was therefore sterile. The wife, however, became pregnant as the result of an adulterous affair. The husband, with the knowledge that he was not the child's father, accepted the child and treated it as his own after the mother told him that her pregnancy had resulted from an affair that she had with a man who lived in another state. Five years later, however, the husband learned that his wife had lied and that the child's biological father was actually the couple's neighbor. This revelation caused the husband to stop treating the child as his and to divorce his wife. *Id.* at 388, 654 A.2d at 571. The wife then filed a support action against the neighbor and sought to have blood tests performed to determine the child's paternity. The trial court, however, held that she was estopped from challenging the paternity of her child because she and her husband had held the child out as a product of their marriage.

On appeal, a panel of this Court held that the mother was not estopped from denying her ex-husband's paternity and that blood tests should have been ordered. *Id.* at 400, 654

A.2d at 577. Three factors dictated our conclusion: (1) the presumption of legitimacy had been rebutted by evidence of the husband's sterility; (2) the lack of an intact family unit; and (3) the party seeking to invoke the doctrine of estoppel had been a party to a misrepresentation. We stated that the second factor—the lack of an intact family unit—was the most important factor in our resolution of the case. *Id.* at 397, 654 A.2d at 575. We noted that "the doctrine of paternity by estoppel grew out of concern for the protection of the family unit" and that when that "unit no longer exists, it defies logic and fairness to apply equitable principles to perpetuate a pretense." *Id.* Because the family unit was not intact, we concluded that the equities of the situation militated against applying the estoppel doctrine. *Id.*

Further, we also considered the impact of the misrepresentation regarding the child's paternity. Although it was the wife, not the putative father, who actively misrepresented the child's paternity, we concluded that it would be inequitable to allow the putative father to invoke paternity by estoppel. We concluded, essentially, that the putative father had unclean hands and thus should not have been permitted to invoke an equitable doctrine. We based this determination on several factors, including that he had: (1) acknowledged the misrepresentation; (2) admitted an intimate relationship with the mother during the time of conception; (3) was aware of the mother's conclusion that he had fathered the child; (4) admitted his paternity to the mother and her sister; and (5) did nothing to dispel the misrepresentation to the mother's husband. *Id.* at 397 n. 9, 654 A.2d at 576 n. 9.

I believe that the factors that dictated the result in *Kohler* are present in this case. First, the presumption of legitimacy has been rebutted by evidence of non-access. Trial Court Opinion, *supra,* at 4–5. Second, after Ruth told David that he was not Zachary's father, their family dissolved. Finally, Robert B.'s conduct, I believe, should prevent him from invoking the estoppel doctrine. Robert B. had engaged in intercourse with Ruth around the time of Zachary's conception. Robert B. knew one month into Ruth's pregnancy that he was

the father of her child. Robert B. pleaded with Ruth to keep the child and promised to "stand by her." N.T., *supra*, at 6. As in *Kohler*, Robert B. did not actively misrepresent the child's paternity but he knew that Ruth had misrepresented Zachary's paternity to David and he remained silent. *Cf. Kohler*, *supra*, at 397 n. 9, 654 A.2d at 576 n. 9. Based on these facts, I would hold that Robert B. should not be allowed to invoke the doctrine of equitable estoppel to bar Ruth from challenging Zachary's paternity. *Cf. id.* Further, I want to emphasize that in a case such as this, involving only the mother and putative father, we are limited to considering only the conduct of those parties.

I also write separately to express my disagreement with the Majority's discussion of res judicata. This issue was neither briefed on appeal nor raised in the trial court. The Majority asserts, without citation to authority, that it can discuss this issue because it affects our jurisdiction. Maj. Op. at 407, 690 A.2d at 1175 n. 1. I know of no authority that supports the proposition that res judicata affects our subject matter jurisdiction. Rather, res judicata—or, more appropriately in this context, collateral estoppel—is a doctrine that prevents the relitigation of issues previously decided. Because this doctrine is unrelated to our jurisdiction, this Court is without authority to reach this issue sua sponte. *See* Pa.R.A.P. 302 (issues not raised in the trial court cannot be raised for the first time on appeal).

Finally, I also disagree with the Majority's finding that a portion of the divorce agreement between David and Ruth is unenforceable. Maj. Op. at 401, 690 A.2d at 1172. David is not a party to this case; his agreement with Ruth is not before this Court. I believe that the Majority erred in several ways by addressing the validity of that agreement. First, the validity of that agreement is not properly before this Court; thus we are without authority to address this issue. *See* Pa.R.A.P. 302. Second, because the validity of that agreement is not an issue that is necessary to the resolution of this case, I conclude that that portion of the Majority Opinion discussing the agreement constitutes an advisory opinion. *See Sedat*,

*Inc. v. Fisher,* 420 Pa.Super. 469, 477, 617 A.2d 1, 4 (1992) (an advisory opinion is one that is unnecessary to decide the case before the court; Pennsylvania courts are prohibited from issuing advisory opinions). Third, by deciding the validity of this agreement without granting David the opportunity to be heard, the Majority has implicated David's due process rights, as guaranteed by the United States and Pennsylvania Constitutions.

I would affirm the order requiring Robert B., Zachary and Ruth to submit to blood tests. Accordingly, I respectfully dissent.

Dissenting Opinion by SCHILLER, Judge:

I join in the thrust of the dissenting opinion of my learned colleague, Judge Johnson. I feel compelled, however, to express my views on the need to reconsider our outmoded jurisprudence in cases of disputed paternity in wedlock.

The issue before us is whether appellee, Ruth F., a divorced mother, can be estopped by appellant, the putative father of her child, from seeking support from him, because the child was born during her marriage to David F., the presumptive father.

The case requires this court to consider the application of the presumption of legitimacy, paternity by estoppel and the statutory provision for blood tests in wedlock.[1] In so doing, the limitations of the common law presumption and the distortion of fact and law caused when it is inflexibly applied come into sharp relief. Deprived of its original purpose by contemporary laws on legitimacy, the presumption today not only

---

1. The majority would also have us consider, as relevant to the case, the right to bargain away child support, surrogacy contracts and *res judicata.* The first two issues are based on inference and analogy, unsubstantiated by fact, and both are irrelevant to the legal question presently before us.

 The contention that the issue of paternity is *res judicata* is not supported by the record. A support action brought by Mr. F. in October 1992 against the parties in this action was dismissed because the F. divorce was not final. Thus, there was never an adjudication on the merits.

forces the law to disregard the availability of accurate scientific evidence,[2] but also leads to the misapplication of the corollary rule of equitable estoppel. As in the instant case, too often, the result stands the underlying objective of each doctrine—fairness to children and their families—on its head. Precisely because the Majority Opinion in this case serves neither children nor their families, I must respectfully dissent from a decision grounded in a rigid and unrealistic application of the law.

The facts here are critical.[3] They bear repeating because

**2.** The accurate determination of the identity of a father requires testing of biological evidence. Medical testing for paternity became available in the 1930s with the development of ABO blood group testing, which provided the first scientific evidence of paternity. Initial tests established non-paternity, indicating to a high degree of probability, through genetic markers, whether a particular man was *not* a child's father. Deborah A. Elingboe, Note, *Sex, Lies and Genetic Tests: Challenging the Marital Presumption of Paternity Under the Minnesota Parentage Act,* 78 Minn.L.Rev. 1013, 1015, fn. 12 (1994). Subsequent scientific advances, including the human leucocyte antigen test (HLA), and most recently DNA fingerprinting have led to the affirmative use of blood tests to establish paternity. DNA testing, in particular, positively identifies the father on the basis of individual specific representations of the DNA configuration of the putative father, the mother and the child. Ronald J. Richards, Comment, *DNA Fingerprinting and Paternity Testing,* 22 U.C. Davis L.Rev. 609, 612–613 (1989).

The first reported American case to recognize the efficacy of these tests was *Commonwealth v. Zammarelli,* 17 Pa.D & C 229 (1931) cited in *Commonwealth ex rel. O'Brien v. O'Brien,* 390 Pa. 551, 563, 136 A.2d 451, 456–457 (1957). *Zammarelli* involved a child born out of wedlock. In 1935, blood test evidence was admitted to overcome the presumption of legitimacy of a child born in wedlock. *Id.* (*Commonwealth ex rel. v. Visocki* 23 Pa.D & C 103 (1935)).

**3.** The majority repeatedly discredits the mother's testimony, styling it as *ex parte,* self-serving and revisionist. If there are deficiencies in the evidence, and I agree that there are, they are the result of our own procedural rules and the legal doctrine relevant when the paternity of a child born in wedlock is contested. Procedurally, this is an appeal to a support claim requiring testimony only of the parties to that claim. Thus, Mr. F. was not a party to the action and he has provided no testimony that might allow an accurate determination of the truth of various statements about his conduct.

Furthermore, the evidence on the record is in large measure a reflection of both parties' efforts to meet the criteria of the applicable common law doctrine of estoppel: to wit, whether or not Mr. and Mrs. F., despite uncertainty about Zachary's paternity, behaved in ways that

they reflect the contemporary fragility of marriage,[4] and underscore the heightened role of the court in protecting the children caught in these dramas.

In April 1994, appellee Ruth F., a single parent, brought an action for child support, on behalf of her son, Zachary, against appellant, the child's alleged biological father. At the time of the action, appellee's divorce had been final for five months. Her marriage, which had produced two older children born in 1983 and 1985, had long been troubled. Since 1988, she had ceased having sexual relations with her former husband and had become intimately involved with appellant. Appellant does not deny the relationship, nor that when he learned she was pregnant and considering an abortion, he urged her to have the child, saying he would stand by her.

Zachary F. was born in June 1989. Despite some doubt on the part of appellee's former husband that he was the child's father[5], Mr. and Mrs. F. attempted to remain together as a family until the summer of 1992. In June of that year,

suggested to the world that Zachary was their child during the period prior to the paternity challenge. Thus, we find the determination of paternity being made on the basis of evidence such as the father's signature on the child's birth certificate, the claim of the child as a dependent on the couple's tax return, and most significantly the mother's complicity in this conduct. The logical deduction, of course, is that if Mr. and Mrs. F., rather than struggling with their disintegrating marriage and the implications for a family with two other children, had immediately announced that Mr. F. was not Zachary's father and treated him accordingly, then Mr. B. could be compelled to undergo a blood test; however, since they tried to make things work and failed, Mr. B. is insulated from accepting his responsibility to Zachary. The illogical result is that we make a determination of what is best for this child without accurate past or current evidence on the actual feelings, economic capacity, or other relevant facts, from either potential father.

4. A recent report on the condition of American children notes that as many as half of all children born in the early 1980s will be children of divorce. In 90% of these cases, custody will be awarded to mothers; in roughly 41% of the cases, there will be no child support agreement in place when the marriage ends. Even when such an agreement is in place, 50% of all fathers renege on full support. Richard Weissbourd, *The Vulnerable Child* 52–53 (1996).

5. Appellee testified that her former husband raised the issue of his paternity on only one occasion before she told him definitively that he was not the father.

appellee told her former husband that he was not Zachary's father. Mr. F. requested blood tests which confirmed his non-paternity. He then left the marriage and filed for divorce in August. Since that time he has not supported Zachary financially or emotionally. During this period Mr. F. also filed a support action against his wife and appellant, which Mrs. F. opposed because she wanted to preserve the marriage.

The parties were divorced in December 1993. The divorce decree incorporated a settlement agreement reflecting the parties' mutual acknowledgement of the paternity of Zachary. Mr. F. agreed to provide support for the two older children of the marriage, but there was no provision for him to support Zachary.

In April 1994, finding herself unable to support the child alone, appellee filed an action for support against appellant. Appellant invoked the presumption of paternity and argued that appellee should be estopped from seeking support from him. A hearing officer, whose determination was upheld by the trial court, found appellee had rebutted the presumption and was not estopped from seeking support. Appellant was ordered to submit to blood testing to determine paternity preliminary to a support determination. He then brought this appeal.[6]

\* \* \* \* \* \*

The majority now bases its holding on the policy considerations that originally motivated development of the presumption of legitimacy. Such an approach has outlived its usefulness. It blinks at the best scientific evidence available, and makes a determination inapposite to nationwide efforts to place child support squarely on the shoulders of identified responsible fathers.[7]

6. This appeal, although interlocutory, was permissible pursuant to the Supreme Court decision in *Jones v. Trojak*, 535 Pa. 95, 634 A.2d 201 (1993).

7. An Executive Order issued by the President in September 1996 is the latest effort to address the issue of delinquent child support payments. The Order requires federal agencies to deny federal loans, such as small business loans, farm loans, and home loans, to deadbeat parents, and to streamline computer systems to identify individuals receiving federal

The presumption of legitimacy, a common law doctrine with roots in Roman law, developed to protect children from the harsh realities of illegitimacy and to stabilize family relationships. Mary Kay Kisthardt, *Of Fatherhood, Families and Fantasy: The Legacy of Michael H. v. Gerald D.*, 65 Tul. L.Rev. 585, 589 (1991). Reinforced by prevailing religious attitudes favoring recognition of children from monogamous marital relationships, Kisthardt, *supra*, at 588, the presumption that a child born to a married woman was the child of her husband was conclusive if the husband was not "beyond the four seas" (i.e., was within the country) prior to or during the pregnancy. *Michael H. and Victoria D. v. Gerald D.*, 491 U.S. 110, 124, 109 S.Ct. 2333, 2342–2343, 105 L.Ed.2d 91 (1989) (citing 1 Blackstone's Commentaries 456 (J. Chitty ed. 1826)). Thus, in an era when blood ties were critical for legal and social status, but biological paternity was a matter of conjecture,[8] marriage became the basis for the legal definition of paternity. Fatherhood became a social construct as well as a biological fact. The advantages of such a construct were many.

A child protected by legitimacy could inherit from his father, had a legal right of support enforceable against his father and could pursue certain tort actions, such as wrongful death suits. (Fathers benefitted as well, for example, through curtesy, which vested only when a child was born, and through entitlement to children's earnings.) No such rights were available to illegitimate children. They could not inherit from their fathers, were limited to a right to support from their mothers and, in the absence of such support, became wards of

payments who also owe child support. Exec.Order No. 13019, 61 Fed.Reg. 51763 (1996).

**8.** Skepticism about paternity is captured in these characteristically cynical lines from Shakespeare:

We are all bastards,
And that most venerable man which I
Did call my father was I know not where
When I was stamped.

*Cymbeline*, act. 2, sc. 5.

the state or church. A child of marriage was also freed from the social stigma of bastardy. Kisthardt, *supra*, at 587–589.

The presumption was also reflected in common law rules of evidence. An evidentiary rule, known as Lord Mansfield's Rule, first articulated in 1777, prevented a husband and wife from testifying to lack of access at the time of conception. *Id.* Subsequently, proof of impotency was added to proof of non-access to rebut the presumption. These traditional rules, intended, primarily, to protect children and, secondarily, to shield families from intrusions into private areas of married life, *Michael H., supra* at 125, 109 S.Ct. at 2343, virtually foreclosed an attack on the paternity of any child born to a couple married in the eyes of the law.

In Pennsylvania, the presumption was adopted based on the public policy concerns of shielding children from illegitimacy, *Cairgle v. American Radiator & Standard Sanitary Corp.*, 366 Pa. 249, 255, 77 A.2d 439, 442 (1951), and supporting the marital family. *Commonwealth ex rel. O'Brien v. O'Brien*, 390 Pa. 551, 555–556, 136 A.2d 451, 453 (1957) ("This presumption is essential in any society in which the family is the fundamental unit.") Our Courts have consistently maintained the presumption's strength by limiting the evidence admissible to rebut it. Although the "four seas" doctrine was abandoned as early as 1814[9], under the modern rule only "clear, direct, convincing and unanswerable" proof of non-access, impotence or lack of sexual intercourse was sufficient to overcome the presumption. *Cairgle, supra* at 256, 77 A.2d at 442 (citations omitted); *McCue v. McCue*, 413 Pa.Super. 71, 75, 604 A.2d 738, 741 (1992) ("Blood test may not be used to rebut paternity in the first instance.... Following rebuttal of the presumption that the child is a child of the marriage by clear and

---

**9.** Then Chief Justice Tilghman found the doctrine unreasonable stating that:

> ... where they (husband and wife) live at a distance from each other, so that access is very improbable, the legitimacy of the child should be decided on a *consideration of all the circumstances.*

*Commonwealth v. Shepherd*, 6 Binney 283, 286 (1814) cited in *Commonwealth ex rel. O'Brien v. O'Brien, supra* at 560–61, 136 A.2d at 455–456 (Chidsey, J. dissenting) (emphasis added).

convincing evidence, the blood test becomes relevant to determine parentage....") (citations omitted).

In the past 36 years, the law relevant to paternity challenges of children born in wedlock has been significantly affected by two actions of the Pennsylvania legislature. The first occurred in 1961, when the Assembly passed the Uniform Act on Blood Tests to Determine Paternity, 28 P.S. § 307.1 *et seq.*[10], repealing the more ambiguously worded 1951 law which had been held not to apply to actions for support of children born in wedlock, *Commonwealth ex rel. O'Brien v. O'Brien, supra,* 390 Pa. 551, 136 A.2d 451. The Uniform Act explicitly provided that the presumption of legitimacy might be overcome by blood test evidence:

> The presumption of legitimacy of a child born during wedlock is overcome if the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests show that the husband is not the father of the child.[11]

28 P.S. § 307.5. The challenge to the presumption inherent in this section reached the court a year later and led to a decision that has shaped all subsequent jurisprudence on paternity in wedlock.

In *Commonwealth v. Goldman,* 199 Pa.Super. 274, 184 A.2d 351 (1962), an action for support of children born in wedlock,

---

**10.** Act of July 13, 1961, P.L. 587, No. 286 §§ 1 to 6. Subsequently amended on July 9, 1976 by P.L. 586, No. 142, § 2 (42 Pa.C.S. §§ 6131 to 6137) and on December 19, 1990, P.L. 1240, No. 206, § 2, 23 Pa.C.S. § 5104.

**11.** This language remains exactly the same in the amended version of the law. 23 Pa.C.S. § 5104(g)—*Effect on presumption of legitimacy.*
Under the current Act, authority for the test is found in § 5104(c): In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.
23 Pa.C.S. § 5104(c).

this Court held that a husband had a right, even in the absence of evidence of non-access or impotency,[12] to an order requiring blood grouping tests when he contested his paternity of a child born during marriage and another born after the parties separated. The *Goldman* court also considered, and accepted, a new counterargument. The plaintiff wife had contended that the doctrine of equitable estoppel should be applied to limit the husband's right to question his paternity. *Id.* at 283, 184 A.2d at 355. Recognizing that the presumption had twin goals—to assure legitimacy *and* support families— the *Goldman* court accepted the doctrine of estoppel in principle.[13] In this instance, however, the court found that the father's conduct did not estop him from overcoming the presumption despite his having supported both children voluntarily for part of their lives and having demanded and received rights of visitation under a temporary support order. *Id.*

**12.** Squarely confronted with the clash of tradition and modernization, the court in *Commonwealth v. Goldman*, 199 Pa.Super. 274, 184 A.2d 351 (1962), granted the right to blood tests, but refused to tamper with the common law testimonial prohibition. Thirteen years went by before the doctrine was overruled in *Commonwealth ex rel. Savruk v. Derby*, 235 Pa.Super. 560, 344 A.2d 624 (1975).

**13.** The *Goldman* court accepted the doctrine by analogizing from adoption by estoppel. The court noted that this doctrine had never before been applied in Pennsylvania "primarily because the strict rules relating to the evidence necessary to overcome the presumption of legitimacy kept the questions of estoppel and laches from becoming an issue." *Goldman, supra* at 283, 184 A.2d at 355.

Long recognized in Pennsylvania, adoption by estoppel precluded a parent from questioning the legality of an adoption where the parent had recognized the parental *relationship*. The doctrine operated primarily in the context of inheritance, protecting legally adopted children, by estopping other parties from asserting that the child was not legally adopted, based on the conduct of the deceased parent. *See* e.g., *Appeal of Wolf*, 13 A. 760 (Pa.1888).

Each doctrine—adoption by estoppel and paternity by estoppel—is an application of the common law doctrine of equitable estoppel which in its generic form "acts to preclude one from doing an act differently than the manner in which another was induced by word or deed to expect." *Zitelli v. Dermatology Education and Research Foundation*, 534 Pa. 360, 370, 633 A.2d 134, 139 (1993). The doctrine has been widely invoked "to prevent the denial, repudiation or questioning of divisions of property, settlement of claims ... the status of an adopted child or a status of legitimacy." 31 C.J.S. § 1.10(8).

In 1990, estoppel was extended to a mother who "cannot hold out her husband to be the father (of her child) and, thereafter, upon separation, charge a different man with paternity." *Christianson v. Ely*, 390 Pa.Super. 398, 402–403, 568 A.2d 961, 963 (1990). In *Christianson*, an action for support brought against a putative father by the mother of a child born during her marriage to another man, this court refused to allow blood tests of the putative father until the trial court determined whether the mother had established by clear and convincing evidence that she and the husband were not estopped from denying the husband's paternity. The case was remanded for further evidence to determine whether estoppel applied. *Id.* at 409, 568 A.2d at 966.[14]

The second significant legislative act occurred in 1971, when the General Assembly eliminated the legal distinction between legitimate and illegitimate children, 23 Pa.C.S. § 5102.[15] As a result, all children were declared legitimate regardless of the marital status of their parents and were accorded all the rights and privileges "as if they had been born during the wedlock of such parents...." The Code also provided for three ways to determine the paternity of children born out of

14. *Christianson v. Ely*, 390 Pa.Super. 398, 568 A.2d 961 (1990), relied on *Michael H. and Victoria D. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), as support for the proposition that "an Order for a blood test would not be permissible to overcome the presumption of legitimacy unless it had first been established that the presumptive parent was not estopped from denying paternity." *Christianson, supra* at 403 fn. 4, 568 A.2d at 963 fn. 4. Justice Scalia was clear, however, in limiting the holding in *Michael H.* to those cases where

> the mother is, at the time of the child's conception and birth married to, and cohabiting with, another man, both of whom wish to raise the child as the offspring of their union.... *We limit our pronouncement to the relevant facts of this case* because it is at least possible that our traditions lead to a different conclusion with regard to adulterous fathering of a child whom the marital parents do not wish to raise as their own.

*Michael H., supra* at 129, fn. 7, 109 S.Ct. at 2345, fn. 7 (emphasis added).

15. Act of June 17, 1971, P.L. 175, No. 17 § 1 as amended by Act of November 26, 1978, P.L. 1216 No. 288. The Act was again amended on Dec. 19, 1990, P.L. 1240, No. 206, § 2.

wedlock,[16] which parallel the means for identifying the father when determining descent through the father for purposes of The Probate, Estates and Fiduciaries Code, 20 Pa.C.S. § 2107(c).

These statutes maximized the ways that the fathers of children born out of wedlock could be identified, and protected these children from the inability to inherit.

\* \* \* \* \* \*

The majority now suggests that the law in Pennsylvania on the subject of paternity is "well-established, clearly stated and easily applied" to any fact situation where these issues arise. (Opinion at p. 402, 690 A.2d at 1172) History and precedent demonstrate otherwise. In recent years, the Pennsylvania Supreme Court has twice spoken on the application and interplay of the presumption of legitimacy, equitable estoppel, and the right to blood test evidence. *See John M. v. Paula T. and Michael T.*, 524 Pa. 306, 571 A.2d 1380 (1990), *cert. denied*, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990); *Jones v. Trojak*, 535 Pa. 95, 634 A.2d 201 (1993).

In *John M.*, the Court addressed a petition for partial custody/visitation in which the petitioner sought to establish that he was the biological father of a child born during the marriage of the mother to another man. Unable to show either non-access or impotency of the husband during the relevant time period, the petitioner sought to compel the husband to submit to blood tests to provide evidence that

**16.** § 5102 *Children declared to be legitimate*

. . . . .

(b) Determination of paternity.—For purposes of prescribing benefits to children born out of wedlock by, from and through the father, paternity shall be determined by any one of the following ways:
(1) If the parents of a child born out of wedlock have married each other.
(2) If, during the lifetime of the child, it is determined by clear and convincing evidence that the father openly holds out the child to be his and either receives the child into his home or provides support for the child.
(3) If there is clear and convincing evidence that the man was the father of the child, which may include a prior court determination of paternity.
23 Pa.C.S. § 5102.

might overcome the presumption of legitimacy. Acknowledging that, in light of the 1971 statute, legitimacy was no longer an issue [17], the Court underlined the force of the presumption holding that there was no good cause to compel the blood test since paternity had already been established by the presumption and no evidence sufficient to overcome it had been presented. (Justice Nix's concurring opinion, joined by four Justices, found that when a third party, who stands outside a marital relationship, challenges the husband's claim to paternity, the presumption that the child is the issue of the husband can be overcome only by proof of facts establishing non-access or impotency. *John M., supra* at 322, 571 A.2d at 1388.) The court did not rely on estoppel, but explained at length the doctrine's role in implementing the Commonwealth's interest in preserving relationships and responsibilities established by the conduct of those who assume and accept parentage roles whether in or out of wedlock. *Id.* at 318–320, 571 A.2d at 1386–1387. The force of this public policy was underscored by discussion of the application of the legislature's codification of paternity by estoppel, 23 Pa.C.S. § 5102(b), as one means to determine the paternity of children born outside of marriage. *Id.* at 318–319, 571 A.2d at 1387, citing *In re Montenegro,* 365 Pa.Super. 98, 528 A.2d 1381 (1987). In these instances paternity is established and blood test evidence may be irrelevant. *John M., supra* at 318, 571 A.2d at 1386.

In *Jones,* however, the Court held that a divorced mother was not estopped from compelling the putative father of her child, born while she was married to another, to submit to blood tests for purposes of a support claim. The Court first held that court ordered blood tests to determine paternity, even though interlocutory, are appealable. Second, the Court distinguished the Commonwealth's concerns when implement-

---

17. The Court declared that since the legal distinction between "legitimate and illegitimate" children had been eliminated by statute, the phrase "presumption of legitimacy" was meaningless and would now be "presumption that a child born to a married woman is a child of the marriage," and, therefore, of the woman's husband. *John M. v. Paula T. and Michael T.,* 524 Pa. 306, 312–313 fn. 2, 571 A.2d 1380, 1383–1384 fn. 2 (1990).

ing the law in cases where the marriage no longer existed as opposed to those where the marital family was intact. Contrasting the situation in *Jones* with that of *John M.*, Chief Justice Nix wrote:

> "Trojak [the appellant] fails to comprehend the important distinction between our reasoning in *John M.* and the facts of the instant case. In *John M.*, our rationale grew out of this Commonwealth's concern for *the survival* of the family unit."

*Jones, supra* at 106, 634 A.2d at 206 (emphasis added). Thus, where the marital family was intact, the power of the presumption remained unquestioned, but in others, such as the *Jones* case, where no marriage remained, the Court adopted an approach that looked to the "actual relationship of the presumptive father and natural mother." [18] *Id.*, citing *Christianson, supra* at 409, 568 A.2d at 966.

Using this framework, the *Jones* court, in a fact sensitive analysis, found that the presumption and estoppel were overcome:

> ... the presumptive father and mother repudiated their marriage vows long ago. Additionally, we have evidence that the presumptive father did not accept the child as his own.... Moreover, the trial court found that during the time Katie was conceived, Jones was not sexually involved with the presumptive father because he was impotent, and this testimony was not rebutted by either the presumptive father or the putative father. Thus, ... there *being no intact family considerations present,* a determination regarding Trojak's [putative father's] paternity is necessary to resolve the child support claim made by Jones [mother].

**18.** While it is undeniably true that the Supreme Court in *Jones, supra,* evaluated the case under traditional estoppel rules, thus utilizing a case by case analytical approach, one could extrapolate from the Court's dependence on the absence of intact family considerations a theoretical basis to distinguish cases such as *John M.,* (where the family objecting to the blood test was an intact unit) and the situation presented by *Jones* and the present case (where the family unit had disintegrated prior to the case entering the legal system). Such an extrapolation, however, would rest with the Supreme Court. It may be time for that Court to reexamine this important area of law.

*Jones, supra,* at 106–107, 634 A.2d at 207 (emphasis added). The Court reached the conclusion that blood test evidence would be admissible despite the fact that Mr. Jones had taken his wife to the hospital to give birth; had acknowledged his paternity on the child's birth and baptismal records; and had paid the cost of hospitalization through his insurance. Furthermore, the Joneses and their three other children remained together as an intact family for 6 months after the child's birth. *Jones v. Trojak,* 402 Pa.Super. 61, 64, 586 A.2d 397, 398 (1991), *aff'd.,* 535 Pa. 95, 634 A.2d 201 (1993). *See also Dettinger v. McCleary,* 438 Pa.Super. 300, 303, 652 A.2d 383, 385 (1994).

The present case is governed by, and factually congruent with, *Jones.* It is an appeal from an order for a blood test preliminary to a support action against a putative father. The marital couple have acknowledged the child's real paternity since their separation. There is uncontroverted evidence that the husband and wife were not sexually involved when the child was conceived. There are no intact family considerations. And, finally, we have clear and convincing evidence that the presumptive father has, at best, ambivalent feelings, and, at worst, bitter feelings toward Zachary. He has behaved accordingly. Under *Jones,* as the trial court held, appellee should not be estopped from seeking blood tests of the putative father as evidence relevant to a support determination. Slip Opinion. *F. v. B.,* Court of Common Pleas of Allegheny County, FD 94–044081995, May 9, 1995.

\* \* \* \* \* \*

My exposition of this sad and difficult case was not undertaken, however, solely to vindicate precedent. Rather, I write to highlight the damage caused by procrustean jurisprudence, and to argue for a new approach that recognizes reality and weighs all relevant evidence. Such an approach would eliminate, at the pre-trial stage, the presumption of legitimacy, and the role of equitable estoppel and heed the legislative command that blood test evidence is relevant in all disputes about biological parentage. In advocating this change, I am not suggesting that results from such blood tests are determina-

tive, but that blood test evidence *is* admissible. It is a legitimate factor to be considered, along with the relationship factors highlighted by equitable estoppel, by a presiding judge in ultimately fixing responsibility for the welfare (financial or other) of a child.[19]

The effect of the purely reflexive application of the traditional rules under the facts of this case highlights the need for this change. Ruth F. is now estopped from seeking support from the child's biological father because for three years she held Zachary out as a child of the marriage (Op. at 407, 690 A.2d at 1175); she cannot compel appellant to undergo the blood testing necessary for a determination of paternity.[20] Appellee's former husband is legally determined to be the father of Zachary with the concomitant liability for support and he is collaterally estopped from contesting that issue. The child, whose well-being should be the fundamental objective of the law, is left without assurance of optimal economic support, and with even less likelihood of emotional support from either man whom he might call father. Appellant, on the other hand, benefits from estoppel, shielding himself from a factual determination that he has a duty to support a child whose paternity he has never denied. The majority, however, assures us that the mother and the presumptive father are now relieved of third party interference "enabling them to go forward with treating Zachary as their child and to provide him the best that both have to offer." (Op. at 412, 690 A.2d at 1177). Whether a function of judicial hope or hubris, this statement defies reason and distorts reality.

We can be certain on this record that Zachary F. will never again be treated as the child of the marriage between Mr. and

---

**19.** Although fully recognizing that this case is about a parent's responsibility for financial support, I am compelled to question whether the majority's position would be the same if the issue were the necessity for accurate medical information in order to investigate genetic predisposition to illness. I suspect that it would not.

**20.** Despite today's holding, we note that after this Court's recent decision in *Shirley v. Javan*, 454 Pa.Super. 131, 684 A.2d 1088 (1996), Zachary F. would probably not be barred from bringing a subsequent paternity action in his own right.

Mrs. F. Since 1992, the public, but, more importantly, all those close to him, including his siblings, have known the actuality of Zachary's parentage. Now seven, Zachary has undoubtedly figured out that his relationship with Mr. F. is different, and if he hasn't determined why, it is only a matter of time before his mother informs him. Only his alleged biological father has attempted to hide the truth by avoiding any connection with the child or his current family. For his efforts, he is rewarded. Finally, the idea that because of a legal edict the presumptive father, who has avoided involvement with this child for five years, will give him his best is mere illusion.

"The rule that misses its aim cannot permanently justify its existence." Benjamin N. Cardozo, *The Nature of the Judicial Process* 66 (1921). The presumption of legitimacy, once a valuable surrogate for the unknowable, has now become a barrier to the truth. Absent its primary purpose—protecting children from illegitimacy—our courts have embraced the doctrine for its secondary role—protecting marital families. Based on the assumption that *any marriage,* regardless of its duration, is the measure of a child's best interest, we have built an elaborate edifice of doctrinal barriers designed to prevent the legal fact of presumptive paternity from ever confronting the scientific fact of biological paternity. It is time for those barriers to come down, and therefore, I respectfully dissent.

KELLY, J., joins.

Dissenting Statement by FORD ELLIOTT, Judge:

I join in the result reached in the Dissenting Opinion by Johnson, J. I agree with Judge Johnson's analysis of the proper interplay between the presumption of legitimacy and paternity by estoppel. However, I write separately to expressly state my disagreement with any reliance on whether or not we are dealing with an "intact family" as a critical factor in the analysis. I don't believe the question of whether the parties are still married or still living together as a family

unit has any application in a determination of whether estoppel applies.

Rather, I agree with Judge Tamilia's analysis that "the time during which the concept of intact family attaches is at the time of birth and the years thereafter during which parents treat the child as a member of the family unit." (Opinion by Tamilia, J. at 407, 690 A.2d at 1175.) It is the status of the child as a member of a family unit that is relevant not whether the mother and father of that family unit are still married. If the presumption that the child is a child of the marriage arises, then for purposes of challenging that presumption, it should not matter that the presumed parents are divorced. By the same token, if the presumption is rebutted, the question of whether estoppel has application should not depend on whether or not the presumed parents are still married or divorced. The doctrine of estoppel did indeed grow out of the protection of the family unit, not the marital unit. The relationship of the child to the mother and the father of that unit survives divorce. I recognize in so stating that my thoughts on this matter represent a minority view.