# Hertz v. Hertz

C.P. of Chester County, no. 01738 N 1999.

*Walter P. Eells,* for plaintiff.
*William Litvin,* for defendant.

ENDY, *S.J.,* May 25, 2000—In the matter at bar, we are asked to determine the post-reconciliation enforceability of an agreement reached through mediation and captioned as a "memorandum of understanding." Because we find the self-styled "memorandum of understanding" to be a valid, comprehensive property settlement agreement rather than a mere separation agreement, it is enforceable against the plaintiff, notwithstanding the parties' interim reconciliation prior to final separation.

Margaret and Cyril Hertz married on June 4, 1988. They have two children, Alexander, born May 30, 1990, and Cody, born May 2, 1993. Ms. Hertz resides with the children in the marital domicile. Mr. Hertz left the marital residence "for good," as the parties contend, on or about September 24, 1999. Ms. Hertz filed for spousal and child support three days later, on September 27, 1999. At present, there is no divorce pending.

As the 1990s drew to a close, the Hertz marriage grew increasingly tumultuous. In February of 1997, Ms. Hertz removed with the children from the marital home. She and the children spent the next five months at her parent's farm in Maryland. About two months into the separation, Mr. Hertz contacted Attorney Merle Horwitz for the purpose of mediating the Hertz' marital problems.

Ms. Hertz returned to the marital home in July 1997. The Hertzs endeavored to improve their marriage by attending counseling sessions together. However, two months later, Ms. Hertz reported her husband to C.Y.F. Subsequently, Mr. Hertz refused to participate in family therapy. Ms. Hertz testified that the couple lived separate and apart in the same home for the next eight months.

In May 1998, Ms. Horwitz prepared the aforementioned "memorandum of understanding," wherein the Hertzs expressed that they "have both agreed to submit the issues of their dissolution of marriage to the mediation process . . . and have achieved a settlement of these issues which they deem fair to each other." The memorandum of understanding memorializes the parties' agreement on all aspects of separation and divorce, from equitable distribution and support to child custody and tax consequences. The preamble to the memorandum's specific terms recites that each party has made a full and fair disclosure to the other of all of his or her respective assets and liabilities. Paragraph II of the memorandum expressly waives each party's "past, present and future right to spousal support and/or alimony." Paragraph III provides that "Cy shall pay the mortgage and real estate taxes on the home . . . in lieu of child support." Lastly, the parties contemplated that the memorandum would be "taken by their respective attorneys in order that those attorneys can process their agreement and obtain for them a dissolution of marriage based upon the settlement they have reached."

On May 31, 1998, roughly two weeks after executing the memorandum of understanding, Mr. Hertz left the

marital residence and began renting a house in Delaware. The parties remained separated for about six months. In November 1998, however, the Hertzs reconciled. Mr. Hertz moved back into the marital home, although he testified he continued to maintain personal property in the Delaware home he rented, and the parties resumed marital relations. The Hertzs socialized as husband and wife, appeared at family functions together, and regularly attended church services as a married couple. In fact, during one particular church service, Mr. Hertz stood up and, in his wife's presence, publicly pronounced his gratitude at their reunification.

The Hertz' enthusiasm at reconciliation dissipated by the fall of 1999. Mr. Hertz returned to Delaware and Ms. Hertz filed for support. At a support conference held on October 28, 1999, Mr. Hertz raised the memorandum of understanding as a bar to Ms. Hertz' claim for spousal support. Ms. Hertz moved for a separate listing. The court entered a temporary order for child support in the amount of $1,682 per month. We held an evidentiary hearing on April 18, 2000, at which both parties were present and represented by counsel.

The first issue with which we are confronted concerns the viability of the parties' postnuptial memorandum of understanding following their subsequent reconciliation. A determination as to whether the memorandum of understanding is enforceable against Ms. Hertz turns on its characterization as either a postnuptial agreement, that is, a complete property settlement agreement, or a mere separation agreement. *Wareham by Trout v. Wareham,* 716 A.2d 674 (Pa. Super. 1998); *Wolfe v. Wolfe,* 341 Pa.

Super. 313, 491 A.2d 281 (1985); *Commonwealth ex rel. DiValerio v. DiValerio,* 169 Pa. Super. 477, 82 A.2d 687 (1951), *allocatur denied.* "Where parties desire to settle and dispose of their respective property rights finally and for all time, such agreement should be construed as a postnuptial agreement." *Wareham by Trout v. Wareham,* 716 A.2d 674, 677 (Pa. Super. 1998); *Commonwealth ex rel. DiValerio v. DiValerio,* 169 Pa. Super. 477, 479, 82 A.2d 687, 688 (1951), *allocatur denied.* A mere separation agreement, in contrast, "is customarily a surrender of the wife's right to support in consideration of some property settlement." *Wareham,* 716 A.2d at 677. It is not intended to constitute a full and final determination of the parties' respective property rights. *Id.* The nature of the agreement "depends upon the intent of the parties as gathered from all the facts." *DiValerio,* 169 Pa. Super. at 479, 82 A.2d at 688.

In *Wareham by Trout v. Wareham,* 716 A.2d 674 (Pa. Super. 1998), the court construed an agreement as a comprehensive postnuptial property settlement where the agreement dealt with the division of marital property, life insurance policies, spousal support, alimony, and the establishment of a trust fund for the children. Like the agreement in *Wareham,* the memorandum of understanding at bar addresses all aspects of marital property and support rights, including equitable distribution, child custody, and the tax consequences incident to divorce.

In *Wolfe v. Wolfe,* 341 Pa. Super. 313, 491 A.2d 281 (1985), the court characterized an agreement as a comprehensive property settlement, or postnuptial agreement, rather than a mere separation agreement, where the agree-

ment recited that "each party releases the other from 'all claims, demands, actions, causes of action or suits at law or in equity . . . .' " *Id.,* 341 Pa. Super. at 318, 491 A.2d at 283. The court also found significant a provision to the effect that "the parties have come to an agreement as to 'all of their said matters of property.' " *Id.,* 341 Pa. Super. at 318, 491 A.2d at 283-84. The memorandum of understanding at bar, in which the parties assert that they "have both agreed to submit the issues of their dissolution of marriage to the mediation process . . . [and] have achieved a settlement of these issue[s] which they deem fair to each other" and express their desire that their respective attorneys "obtain for them a dissolution of marriage based upon the settlement they have reached," echoes the breadth and permanence of the provisions in the *Wolfe* agreement which led the court to find that a comprehensive postnuptial agreement existed.

Based on the foregoing, we find that the parties' memorandum of understanding constitutes a full and final determination of the parties' marital rights incident to separation and divorce; that is, we conclude that it is a comprehensive postnuptial agreement. It is valid as it acknowledges that the parties have provided a full and fair disclosure of their assets and liabilities and contains an express waiver of statutory rights. See *Simeone v. Simeone,* 525 Pa. 392, 581 A.2d 162 (1990). As a comprehensive postnuptial agreement, it survives the parties' subsequent reconciliation. *Wareham by Trout v. Wareham,* 716 A.2d 674, 677 (Pa. Super. 1998); *Wolfe v. Wolfe,* 341 Pa. Super. 313, 317 n.2, 491 A.2d 281, 283 n.2 (1985); *Commonwealth ex rel. DiValerio v. DiValerio,*

169 Pa. Super. 477, 479, 82 A.2d 687, 688 (1951), *allo-catur denied.* It is therefore enforceable against Ms. Hertz' claim for spousal support. It is not, however, enforceable against her claim for child support. A parent may not bargain away his or her child's right to support. *Ruth F. v. Robert B.,* 456 Pa. Super. 398, 690 A.2d 1171 (1997), *aff'd; Fish v. Behers,* 741 A.2d 721 (1999); *Hyde v. Hyde,* 421 Pa. Super. 415, 618 A.2d 406 (1992). Mr. Hertz' mortgage payments do not represent the extent of his child support responsibilities. We now turn to the scope of his financial obligation to his children.

Mr. Hertz is a salesman for Aspen Technologies. He sells software to the industrial marketplace. Based on his 1999 federal form 1040 and his 1999 W-2 and earnings summary, Mr. Hertz received compensation, including bonuses and adding back his group term life insurance payments, of $139,628. He also received $3 in ordinary dividend income, $13,770 in capital gains (an historical source of income for Mr. Hertz), and $142 in taxable refund income. In 1999, Mr. Hertz had a gross annual income of $153,543.

Using a tax status of married, filing separately, with two exemptions and itemizing deductions, we estimated Mr. Hertz' federal income tax liability to be $37,422. In accordance with exhibit D-9, we assessed Mr. Hertz a Delaware state tax liability of $6,036. We estimated his local Wilmington tax liability to be $1,745. Finally, based on his 1999 W-2, we found Mr. Hertz' FICA and Medicare obligations to be $6,471. Mr. Hertz' total estimated tax liability for 1999 amounted to $51,674. Deducting Mr. Hertz' taxes from his gross annual income, Mr. Hertz

is left with a net annual income of $101,869, or $8,489 per month.

Ms. Hertz received her associates' degree in nursing in 1975. Currently she is licensed as a registered nurse in this Commonwealth. In the past, she has been licensed in Maryland and Delaware, but those licenses have since expired. She has a history of employment in hospitals and private practice, albeit mostly part-time, but she is not working as a nurse now. At present, she cleans houses and gardens for friends and acquaintances and earns a nominal sum from this occupation.

Ms. Hertz last worked full-time from February 1998 to January 1999 in a counseling position. Her 1998 W-2 reveals that she earned $29,269.80 in the 11 months during which she held this position. In addition, she received $30 in 1998 from working as a substitute school nurse in the Avon Grove School District. Finally, she also received $1,669.50 through employment with a firm called Recruitment Specialists Inc. In 1998, Ms. Hertz grossed $30,969.30.

Mr. Hertz introduced testimony from a vocational expert, Dr. Sally Kneipp Ph.D., who opined that, as a nurse, Ms. Hertz has an earning capacity of $43,000 per year. While we agree that, under the circumstances, Ms. Hertz should be attributed an earning capacity greater than the nominal sum she realizes from gardening and house-cleaning, we find Dr. Kneipp's estimation too high, given Ms. Hertz' history of primarily part-time employment and her demonstrated earnings. Ms. Hertz concedes an earning capacity in the range of $26,000 to $30,000 per year. Considering her work history and actual earnings,

her education, and the fact that both of her children attend school full-time, we find an earning capacity of $30,000 gross per year a reasonable representation of Ms. Hertz' income potential at this time.

Based on her imputed earnings, and utilizing a tax status of married, filing separately, with two exemptions and the standard deduction, we estimated Ms. Hertz would pay $3,135 in federal taxes, $840 in state taxes, $300 in local wage tax, and $2,295 in FICA/Medicare contributions, for a total tax liability of $6,570. Deducting this sum from her imputed gross earnings, we find Ms. Hertz has a net annual earning capacity of $23,430, or $1,953 per month.

The Hertzs' combined net income/earning capacity is $10,442 per month. At this level, the guidelines instruct that the Hertzs should allocate $2,413 per month towards the support of their two children. See Pa.R.C.P. 1910.16-3(b), 42 Pa.C.S. Mr. Hertz shares 81 percent of the parties' combined monthly net, therefore, preliminarily, he is responsible for 81 percent of the children's basic support, or $1,955 per month. However, Mr. Hertz is entitled to have this sum adjusted to incorporate a contribution from Ms. Hertz representing her share of the health insurance premiums Mr. Hertz maintains on the children's behalf. Pa.R.C.P. 1910.16-4(a)(III), 1910.16-6(b), 42 Pa.C.S. Calculating the cost of providing health insurance coverage for the children in accordance with Pa.R.C.P. 1910.16-6(b)(2), 42 Pa.C.S., we find Mr. Hertz spends $384 per year on the children's health insurance coverage. With 19 percent of the parties' combined monthly net, Ms. Hertz is responsible for 19 percent of

the children's health insurance premium expense, which sum amounts to $6 per month. In accordance with the support guidelines, Pa.R.C.P. 1910.16-4(a)(III), 1910.16-6(b), 42 Pa.C.S., Mr. Hertz' monthly child support obligation will be reduced by $6 per month to account for Ms. Hertz' share of the children's health insurance premiums. Thus, Mr. Hertz' child support obligation, net of Ms. Hertz' contribution to health insurance, is $1,949 per month.

Mr. Hertz will be required to maintain health insurance coverage for the couple's children. Unreimbursed medical expenses, as that term is defined by Pa.R.C.P. 1910.16-6(c)(1), 42 Pa.C.S., shall be divided between the parties in proportion to their net incomes/earning capacities. Mr. Hertz will be responsible for 81 percent of said expenses and Ms. Hertz will be responsible for the remaining 19 percent. Mr. Hertz is not entitled to credit for the automobile (Caravan) loan payments he has made or for the clothing he has purchased on behalf of the children, as these are voluntary undertakings on his part. Further, we will defer for equitable distribution any credit to Mr. Hertz for the mortgage payments he has made because we consider it unmeet to compromise the children's support in accommodation of the parents' choice of shelter. Mr. Hertz, however, will receive credit for all support payments made pursuant to the temporary order entered October 28, 1999. Finally, Mr. Hertz will be required to pay the additional sum of $250 per month towards arrears until paid in full. The effective date of this order is September 27, 1999.

## ORDER

And now, May 25, 2000, upon consideration of the foregoing, and based upon this court's determination that Cyril G. Hertz' net income is $8,489 per month and Margaret Hertz' net earning capacity is $1,953 per month, it is hereby ordered and decreed that:

(1) Cyril G. Hertz shall pay to the Support Collection and Disbursement Unit in Harrisburg, Pennsylvania for transmission to Margaret Hertz the sum of $1,949 per month in support of the parties' two minor children, Alexander, d.o.b. 5/30/90 and Cody, d.o.b. 5/2/93;

(2) Cyril G. Hertz shall continue to provide health insurance coverage on behalf of the children. Unreimbursed medical expenses, as that term is defined in Pa.R.C.P. 1910.16-6(c)(1), shall be divided between the parties in proportion to their net incomes/earning capacities; that is, Mr. Hertz shall be responsible for 81 percent of said expenses and Ms. Hertz shall be responsible for the remaining 19 percent;

(3) Cyril G. Hertz shall receive credit for all support payments made pursuant to the temporary order entered October 28, 1999;

(4) Cyril G. Hertz shall pay to the Support Collection and Disbursement Unit in Harrisburg, Pennsylvania for transmission to Margaret Hertz the additional sum of $250 per month towards arrears until paid in full;

(5) The effective date of this order is September 27, 1999.